[No. 64783-6. En Banc.]

Argued May 28, 1997.     Decided February 5, 1998.

TOLLISON MCKINNEY, ET AL., *Appellants*, v. THE STATE OF WASHINGTON, *Respondent*.

*Brett & Daugert, Attorneys at Law, L.L.P.,* by *Timothy C. Farris* and *Philip J. Buri,* for appellants.

*Christine O. Gregoire, Attorney General,* and *Jeffrey A. Freimund, Assistant,* for respondent.

TALMADGE, J. — In a case with very compelling facts, we must decide if Washington recognizes a cause of action for the negligent failure of an adoption placement agency[1] to disclose statutorily-mandated information about the child to prospective adoptive parents. We hold adoptive parents may state a cause of action against an adoption placement

---

[1]RCW 26.33.020(7) defines an "agency" for purposes of the adoption statute as "any public or private association, corporation, or individual licensed or certified by the department as a child placing agency under chapter 74.15 RCW or as an adoption agency." Any reference herein to "adoption placement agency" means an agency under the statutory definition. While DSHS is the defendant in this case, the statute affects public and private placement organizations, as well as individuals.

agency for the negligent failure to meet the disclosure requirements of RCW 26.33.350 or RCW 26.33.380. We further hold the status of prospective adoptive parent[2] attaches when the child is eligible for adoption under RCW 26.33, and the persons interested in adopting the child have manifested a formal intent to adopt and the adoption placement agency has formally acknowledged the eligibility of such persons to adopt the child.

In the present case, the trial court properly instructed the jury on the duty of the Department of Social and Health Services (DSHS), the adoption placement agency, to disclose information to the McKinneys, on their status as prospective adoptive parents, and on proximate cause. Substantial evidence supported the jury's determination DSHS was negligent, but such negligence was not a proximate cause of damages to the McKinneys. We affirm the trial court's judgment.

## ISSUES

1. Is a cause of action recognized in Washington for the negligent failure of an adoption placement agency to disclose to prospective adoptive parents statutorily-mandated information regarding the child?

2. When did the McKinneys become prospective adoptive parents, triggering the disclosure requirements of RCW 26.33.350 or .380?

3. Is the jury's verdict supported by substantial evidence?

## FACTS

The McKinneys became acquainted with Gabriella (Abby) in 1985 when she was two and a half years old and in fos-

---

[2] While RCW 26.33.350 and .380 refer to "prospective adop*ting* parent," we use the terms "prospective adop*tive* parent" and "prospective adop*ting* parent" interchangeably.

ter placement with a friend. For six months to one year, they were Abby's baby-sitters on weekends and when the foster mother was out of town. Through this contact with Abby, the McKinneys knew: Abby had behavior problems including approximately twenty to thirty temper tantrums a day; there were rumors that she had been sexually abused; she was not talking; she did not engage in play like other children her age, nor did she seem to want to jump, climb, or even walk to any length; she was in a special education program; she was receiving speech therapy and physical therapy; she was receiving counseling and treatment at Good Samaritan Mental Health Center (Vicky McKinney accompanied Abby and the foster mother to at least one of these mental health appointments in 1985); Abby had already been in several foster homes and was removed from the biological mother due to neglect; the biological mother "liked to party"; and Abby was developmentally delayed.

Despite Abby's special needs and troubled history, the McKinneys admitted they fell in love with Abby at first sight, and unilaterally decided to adopt Abby before they ever met a caseworker. On October 25, 1985, the McKinneys applied to Catholic Community Services to become foster parents. Although they had decided to adopt Abby, they indicated on the foster application they had not applied to adopt a child.

Abby was placed in the McKinneys' home as a foster child on August 1, 1986. The McKinneys acknowledge this was a foster placement, for which they received regular monthly foster care payments and a special needs allowance from DSHS for Abby because of her developmental problems. In 1986, Vicky McKinney asked a state caseworker to have Abby's medical records forwarded to the family pediatrician, but the records were not sent.

From the time of Abby's foster placement in the McKinneys' home in 1986, until the McKinneys applied to adopt her in 1989, they gained more knowledge of Abby's background and medical/psychological condition. In 1986,

Vicky McKinney indicated to a caseworker she understood Abby's biological mother drank heavily while pregnant with Abby. Vicky McKinney also had a copy of a doctor's letter indicating Fetal Alcohol Syndrome (FAS) was a possibility in Abby's case, and stating Abby may have been born prematurely. In a conversation between Abby's developmental disabilities caseworker and Vicky McKinney, the caseworker expressed her concerns regarding Abby's developmental delays and the fact that "we did not have a clear knowledge of what Abby's needs would be or how long the behaviors would continue." Report of Proceedings at 1779. Responding to the caseworker's concern about the McKinneys' decision to adopt Abby in light of these uncertainties, Vicky McKinney "indicated that they were clear with that decision." Report of Proceedings at 1779.

The parental rights of Abby's birth parents were terminated in November 1987, freeing Abby for adoption.

In 1988, caseworkers discussed with the McKinneys an array of Abby's problems including possible FAS, sexual abuse, and mental retardation. When the McKinneys filed their adoption application for Abby on August 5, 1988, they also applied for an adoption support subsidy, listing Abby's special needs as hyperactivity, learning disability, and alcohol syndrome. On March 21, 1989, the McKinneys' application for an adoption support subsidy for Abby was accepted by DSHS. A preplacement evaluation or "home study" on the McKinneys, as required by RCW 26.33.190, was completed by April 1990.

On January 9, 1990, the McKinneys received the Child's Medical and Family Background Report from DSHS, which noted Abby's developmental delays and her biological mother's history of alcohol abuse. Vicky McKinney spoke with a nurse at the University of Washington's FAS Clinic on March 28, 1990, regarding Abby; the nurse sent her five articles regarding FAS and FAE (Fetal Alcohol Effect), which Vicky McKinney confirmed she read in April 1990. Through a referral from the UW FAS Clinic, the McKinneys took Abby to a FAS specialist for an evaluation. That

doctor concluded Abby had possible FAE. Abby was diagnosed as having FAS in December 1993.

Upon completion of a favorable home study, the Pierce County Superior Court entered a formal decree of adoption on June 19, 1990, placing Abby with the McKinneys.

The McKinneys did not receive all the medical and social records on Abby's birth and upbringing until after the formal adoption. After the adoption, the McKinneys requested and received Madigan Army Medical Center birth records concerning Abby's premature birth. In April 1992, the McKinneys requested and received DSHS's records concerning Abby, which indicated there were questions as early as 1984 that Abby's problems might be attributable to her birth mother's alcohol abuse. Other theories for Abby's problems, such as Down's Syndrome, were also considered in the records. As early as 1984, DSHS records also contained police reports and medical records indicating Abby may have been sexually abused.

The McKinneys filed this action against DSHS in November 1993, alleging negligence, violation of 42 U.S.C. § 1983, and outrage. An amended complaint added causes of action for fraud and breach of contract. The breach of contract claims were dismissed on summary judgment. The fraud claims were dismissed on DSHS's motion at the close of plaintiff's case.[3] The case went to the jury only on the McKinneys' negligence claims.

In conjunction with pretrial motions, the trial court decided the issue of when the McKinneys became prospective adoptive parents. The State argued such status attached only when the McKinneys formally petitioned to adopt and the home study on them was completed. The McKinneys contended the appropriate date was August 1, 1986, the date Abby was first placed in their home. The trial court ruled that when the McKinneys' written application to adopt and request for adoption support assistance was approved by DSHS on March 21, 1989, they

---

[3]The McKinneys do not appeal the dismissal of any of these nonnegligence claims.

became prospective adopting parents, and later so instructed the jury. The jury returned a defense verdict after a month-long trial, finding DSHS negligent, but such negligence was not the proximate cause of damages to the McKinneys. Both parties appealed and we granted direct review. RAP 4.2(a).

## ANALYSIS

A. Negligent Failure of an Adoption Agency to Disclose Information on a Child to Prospective Adoptive Parents

The McKinneys assert had they known the truth about Abby's developmental and other problems they would not have taken her into their home or adopted her. They claim DSHS's negligent failure to disclose medical and other background information about Abby affected their adoption decision.

The State argues the trial court's recognition of a wrongful adoption claim based on negligence is unprecedented and only causes of action for fraud and intentional misrepresentation in failing to disclose pertinent information about an adoptive child have been recognized in other jurisdictions. The State further contends public policy concerns weigh against creating a cause of action for wrongful adoption based on negligence because adoption agencies should not be required to guarantee the health of the children they place or have the burdensome duty to discover and disclose all health information regarding the child.

The trial court determined the McKinneys' negligence claims survived the State's motions for summary judgment and directed verdict or judgment as a matter of law under CR 50 because a claim for negligent adoption placement, including negligent failure to investigate, locate or disclose information, may be made under RCW 26.33.350. The court ultimately instructed the jury on both RCW 26.33.350 and .380.

Under the current versions of RCW 26.33.350 and .380, DSHS has a duty to timely provide medical and social in-

formation regarding the child and the child's birth parents to prospective adoptive parents.[4] The current version of each statute requires a placement agency to make reasonable efforts to obtain background information described in the statute and disclose such information to prospective adoptive parents, but the agency has no further duty to

---

[4]RCW 26.33.350 as amended provides in pertinent part:

(1) Every person, firm, society, association, corporation, or state agency receiving, securing a home for, or otherwise caring for a minor child shall transmit to the prospective adopting parent prior to placement and shall make available to all persons with whom a child has been placed by adoption a complete medical report containing all known and available information concerning the mental, physical, and sensory handicaps of the child.

(2) The report shall not reveal the identity of the birth parent of the child except as authorized under this chapter but shall include any known or available mental or physical health history of the birth parent that needs to be known by the adoptive parent to facilitate proper health care for the child or that will assist the adoptive parent in maximizing the developmental potential of the child . . . .

(4) Entities and persons obligated to provide information under this section shall make reasonable efforts to locate records and information concerning the child's mental, physical, and sensory handicaps. The entities or persons providing the information have no duty, beyond providing the information, to explain or interpret the records or information regarding the child's present or future health.

RCW 26.33.380 as amended provides:

(1) Every person, firm, society, association, corporation, or state agency receiving, securing a home for, or otherwise caring for a minor child shall transmit to the prospective adopting parent prior to placement and shall make available to all persons with whom a child has been placed by adoption, a family background and child and family social history report, which includes a chronological history of the circumstances surrounding the adoptive placement and any available psychiatric reports, psychological reports, court reports pertaining to dependency or custody, or school reports. Such reports or information shall not reveal the identity of the birth parents of the child but shall contain reasonably available nonidentifying information.

(2) Entities and persons obligated to provide information under this section shall make reasonable efforts to locate records and information concerning the child's family background and social history. The entities or persons providing the information have no duty, beyond providing the information, to explain or interpret the records or information regarding the child's mental or physical health.

explain or interpret such information. *See* RCW 26.33.350(4) and .380(2).[5]

■ ■ We believe the Legislature has established the duty owed by adoption placement agencies in RCW 26.33.350 (medical/psychological history) and RCW 26.33.380 (social history). The negligent failure of an adoption placement agency to comply with the statutory disclosure mandate to prospective adoptive parents may result in liability. The scope of the agency's duty is appropriately drawn in those disclosure statutes.

A duty predicated upon a statutory obligation has been recognized in analogous settings by our courts. In *Lesley v. Department of Soc. & Health Servs.*, 83 Wn. App. 263, 273, 921 P.2d 1066 (1996), *review denied*, 131 Wn.2d 1026, 939 P.2d 216 (1997), and *Yonker v. Department of Soc. & Health Servs.*, 85 Wn. App. 71, 930 P.2d 958 (1997), the Court of Appeals upheld a cause of action for negligent investigation against DSHS caseworkers based on RCW 26.44.050 where caseworkers have a statutory duty to investigate possible occurrences of child abuse or neglect.[6]

Similarly, in *Gibbs v. Ernst*, 538 Pa. 193, 647 A.2d 882 (1994), the Pennsylvania Supreme Court recognized a cause of action for negligent failure to disclose information based

---

[5]The obligation in RCW 26.33.350 to disclose relevant medical/psychological data regarding the child and its birth parents to the prospective adopting parent prior to placement was imposed by the original 1984 statute. *See* LAWS OF 1984, ch. 155, § 37. Enumeration of the types of information to be supplied was added in 1989. LAWS OF 1989, ch. 281, § 1. Language regarding "reasonable efforts to locate" and limiting the duty to interpret the information was added in 1994. LAWS OF 1994, ch. 170, § 1.

In 1989, RCW 26.33.380 was enacted, requiring disclosure of the family background and child/family social history. *See* LAWS OF 1989, ch. 281, § 2. Language regarding "reasonable efforts to locate" and limiting the duty to interpret the information was also added in 1994. LAWS OF 1994, ch. 170, § 2.

[6]*See also Babcock v. State*, 116 Wn.2d 596, 606, 618, 809 P.2d 143 (1991) (recognizing tort liability for negligent foster care investigation and placement); *Waller v. State*, 64 Wn. App. 318, 334, 824 P.2d 1225 (recognizing possible liability for negligent investigation by DSHS caseworkers), *review denied*, 119 Wn.2d 1014, 833 P.2d 1390 (1992); *Dunning v. Pacerelli*, 63 Wn. App. 232, 238-40, 818 P.2d 34 (1991), *review denied*, 118 Wn.2d 1024, 827 P.2d 1392 (1992) (recognizing a negligent investigation claim against a DSHS worker).

on statutory obligations comparable to those imposed by the Washington statutes. The court found Pennsylvania's disclosure statute, which requires an adoption agency to obtain medical history on adoptees and to "deliver such information to the adopting parents or their physician" created a duty to reveal all available nonidentifying information about a child. *Gibbs*, 647 A.2d at 892. The *Gibbs* Court found this duty to be consistent with the intent of the Pennsylvania legislature and recognition of a cause of action based on statute was also consistent with long-standing common-law principles. *Id.*

Aside from the statutory imperative, there are strong public policy grounds for establishing a cause of action for prospective adoptive parents against adoption placement agencies that negligently fail to disclose pertinent information about the child. The *Gibbs* court found the unique relationship of trust and confidence between the agency and the prospective parents supports a disclosure duty:

> Even were the statutory foundation for the assignment to adoption intermediaries of a duty to disclose less persuasive, we find that the unique relationship between the adoption agency and the prospective parents gives rise to such a responsibility . . .
>
> The adoption agency—adopting parent connection is, or should be, one of trust and confidence, differing significantly from a business arrangement in which two parties to a transaction may maintain silence in order to negotiate the stronger position, and are under no obligation to divulge information which may weaken that position. . . . Rather, this relationship is a singular one in that the parties act not as adversaries, but in concert to achieve a result desired by both sides, the creation of a viable family unit. . . . We thus conclude that a duty to disclose is created by this unique association.

*Id.* at 892-93 (citations omitted). The special relationship between adoption placement agencies and adopting parents argues strongly for recognition of a cause of action in tort. *Cf., Harbeson v. Parke-Davis, Inc.*, 98 Wn.2d 460, 467, 656 P.2d 483 (1983) (tort of wrongful birth sounding in

negligence recognized because the action conforms comfortably to the structure of tort principles and is a logical and necessary development).

In *Mohr v. Commonwealth*, 421 Mass. 147, 653 N.E.2d 1104, 1113 (1995), the Supreme Judicial Court of Massachusetts recognized claims for negligent, as well as intentional, failure to disclose information based on a statutory disclosure duty.[7] The Court concluded public policy ultimately favors recognizing liability for an adoption agency's material misrepresentations of fact regarding the child's history prior to adoption. *See Mohr*, 653 N.E.2d at 1111-13. Recognizing representative cases in which courts had limited liability to claims involving intentional conduct,[8] the *Mohr* court noted:

> Other courts, however, have held that, . . . public policy also supports recognizing the tort of negligent misrepresentation in the adoption context. These courts have emphasized "the compelling need of adoptive parents for full disclosure of medical background information that may be known to the agency on both the child they may adopt and the child's genetic parents, *not only to secure timely and appropriate medical care for the child, but also to make vital personal, health and family decisions.*" This need . . . outweighs any increased

---

[7]*See Mohr*, 653 N.E.2d at 1112, *citing* 5 MASS. REGS. CODE tit. 110, § 7.213(3) (1994) ("[t]he Department [of Social Services] shall provide the adoptive parent with all relevant information about a child to enable the adoptive parent to knowledgeably determine whether to accept the child for adoption").

[8]*See Mohr*, 653 N.E.2d at 1111, *citing Burr v. Board of County Comm'rs*, 23 Ohio St. 3d 69, 78, 491 N.E.2d 1101, 56 A.L.R.4TH 357 (1986) ("[i]t is not the mere failure to disclose the risks inherent in [the] child's background which we hold to be actionable [but] the deliberate act of misinforming [the plaintiffs] which deprived them of their right to make a sound parenting decision and which led to the compensable injuries"); *Michael J. v. Los Angeles County Dep't of Adoptions*, 201 Cal. App. 3d 859, 874-75, 247 Cal. Rptr. 504 (1988) ("an adoption agency cannot be made the guarantor of an infant's future good health and should not be liable for mere negligence in providing information regarding the health of a prospective adoptee"); *Richard P. v. Vista Del Mar Child Care Serv.*, 106 Cal. App. 3d 860, 866-67, 165 Cal. Rptr. 370 (1980) ("no cause of action for negligence should be recognized based on considerations of public policy"); *Foster by Foster v. Bass*, 575 So. 2d 967, 981 (Miss. 1990) (court refused to recognize tort of negligence in adoption context because result not foreseeable); *Juman v. Louise Wise Servs.*, 211 A.D.2d 446, 620 N.Y.S.2d 371, 372 (1995) (recognizing "wrongful adoption" cause of action grounded in fraud and fraudulent misrepresentation).

*burden that is placed on adoption agencies when liability is imposed for negligent as well as intentional misrepresentation.* In addition, these courts have maintained that *allowing negligent misrepresentation claims against adoption agencies does not subject agencies to potentially limitless liability or make them guarantors of adopted children's health . . .*

. . . We agree.

*Id.* at 1111-12 (emphasis added, citations omitted).

In *Mallette v. Children's Friend & Serv.*, 661 A.2d 67, 73 (R.I. 1995), the Rhode Island Supreme Court recognized a claim for negligent misrepresentation despite the fact Rhode Island had no statutory duty to disclose, declaring:

the need for accurate disclosure becomes more acute when special-needs children are involved. Parents need to be financially and emotionally equipped to provide an atmosphere that is optimally conducive to that special child's growth and development. Although biological parents can assess the risks of having a child by investigating their own genetic backgrounds, adopting parents remain at the mercy of adoption agencies for information, . . . We believe extending the tort of negligent representation to the adoption context will help alleviate some of the artificial uncertainty imposed on a situation inherent with uncertainty.

*Id.*

We are mindful of the concern a broad duty of disclosure could impose an excessive burden on adoption placement agencies who are exerting their best efforts to place children with loving adoptive parents. This concern is particularly acute for special-needs children like Abby. But we believe the Legislature understood this concern in limiting the scope of disclosure and confining agency investigative efforts to reasonable efforts in both RCW 26.33.350 and .380. We agree with the *Gibbs* Court when it stated:

We find that the creation of a duty in this instance will further the interests of parents by providing them with as much factual and valid information as possible about the child they are to adopt without placing an undue burden on adoption

agencies, as they are required only to make reasonable efforts to disclose fully and accurately the medical history they have already obtained. Only where adoption intermediaries disclose information negligently will they be liable. Thus, the only burden on adoption intermediaries is the obligation to make a reasonable investigation of their records, and to make reasonable efforts to reveal fully and accurately all non-identifying information in their possession to the adopting parents. We do not believe that this responsibility constitutes an undue burden in light of the important interests served by its performance.

647 A.2d at 893.

We hold the negligent failure of an adoption placement agency to disclose the information required by RCW 26.33.350 or .380 to prospective adoptive parents is actionable.[9] Disclosure of a child's medical/psychological and familial background will not only enable Washington's adoptive parents to obtain timely and appropriate medical care for the child, but it will also enable them to make an intelligent and informed adoption decision.

B. Prospective Adoptive Parents

The duty to disclose under RCW 26.33.350 or .380 attached when the McKinneys became prospective adoptive parents, but the statute does not define the term. The adoption statute only cursorily defines "adoptive parent." RCW 26.33.020(4).[10]

In addressing pretrial motions, the trial court was

---

[9]Recent cases from other jurisdictions addressing wrongful adoption also indicate a growing trend in which courts are recognizing wrongful adoption claims based on negligence theories, including negligent failure to disclose. *See* Marianne Bower Blair, *The Uniform Adoption Act's Health Disclosure Provisions: A Model That Should Not Be Overlooked*, 30 FAM. L. Q. 427, 470-74 (Summer 1996); *see also*, Marianne Bower Blair, *Getting the Whole Truth and Nothing But the Truth: The Limits of Liability for Wrongful Adoption*, 67 NOTRE DAME L. REV. 851 (1992) (collecting wrongful adoption cases and examining the conduct held actionable and the legal theories recognized).

[10]Inexplicably, the Legislature has relied on the definition of "prospective adoptive parent, as defined in RCW 26.33.020" in other contexts, but no such definition appears therein. RCW 43.43.830(1)(c).

confronted with several different options for the date upon which the McKinneys became prospective adoptive parents. On the suggestion of the McKinneys' attorney, the trial court considered WAC 388-70-460 as a convenient guidepost in determining when the McKinneys' status changed from foster parents to prospective adoptive parents. WAC 388-70-460, regarding adoption services for families, states in part:

(1) Department placements:

(a) Applications are accepted from families residing in the state of Washington based upon the anticipated children needing placement;

(b) Upon acceptance of an application, a home study shall be initiated . . .

The McKinneys' attorney argued the filing of the adoption application on August 5, 1988, changed the McKinneys' from foster parents to prospective adoptive parents. The McKinneys assert on appeal because RCW 26.33.350 requires disclosure of Abby's background information to prospective adoptive parents prior to placement, they should have received Abby's records on August 1, 1986 when Abby was placed in their home. Br. of Appellant at 24.

The State below claimed the McKinneys did not become prospective adopting parents until the home study was completed in April 1990 because a home study was a mandatory condition to any adoption. RCW 26.33.180.

The trial court ruled DSHS's obligation to the McKinneys began when the adoption application was signed by DSHS on March 21, 1989, indicating DSHS's acceptance of the McKinneys' application and approval of their request for an adoption subsidy for Abby. Instruction 16 stated: "The McKinneys became prospective adoptive parents on March 21, 1989. The adoption took place June 19, 1990." The McKinneys claim the instruction is erroneous because it misconstrues the purpose of disclosure, fails to acknowledge DSHS recognized the McKinneys as potential or likely

adoptive parents for Abby much earlier than March 21, 1989, and invaded the province of the jury by resolving an issue of fact. Br. of Appellant at 22-24.

The trial court correctly determined the disclosure requirements of RCW 26.33.350 or .380 were triggered with DSHS's acceptance of the McKinneys' eligibility to adopt and receive adoption support payments. First, when reasonable minds could reach but one conclusion from the evidence presented, questions of fact may be determined as a matter of law. *State v. Clark*, 129 Wn.2d 211, 225, 916 P.2d 384 (1996); *Kadoranian v. Bellingham Police Dep't*, 119 Wn.2d 178, 190, 829 P.2d 1061 (1992); *Central Wash. Bank v. Mendelson-Zeller, Inc.*, 113 Wn.2d 346, 353, 779 P.2d 697 (1989).

As to the substantive issue, in *In re Dependency of G.C.B.*, 73 Wn. App. 708, 719, 870 P.2d 1037, *review denied*, 124 Wn.2d 1019, 881 P.2d 254 (1994), the Court of Appeals noted in dicta:

> An adoption proceeding is initiated when a "prospective adoptive parent" files a petition for adoption accompanied by a preplacement report. RCW 26.33.150(1), (5). The statute does not define "prospective adoptive parent", nor does it describe the qualifications necessary to become one. Although "[a]ny person who is legally competent and who is eighteen years of age or older may be an adoptive parent", RCW 26.33.140(2), it does not follow that every such person is a "prospective adoptive parent" with the right to commence adoption proceedings and obtain placement of a particular child. Rather, we surmise from both common sense and a long line of Supreme Court authority that *it is ordinarily the prerogative of the Department or child-placing agency to designate prospective adoptive parents for a particular child.*

(Emphasis added.) The Court of Appeals implored the Legislature to "define the statutory term 'prospective adoptive parent,' clearly setting forth the prerequisites to becoming one." *Id.* at 722. Nevertheless, the Legislature has not provided such a definition. For purposes of the requirements of RCW 26.33.350 and .380, we adopt the es-

sence of the test from *G.C.B.* for prospective adoptive parent, mindful of the fact the Legislature has declined to provide a more comprehensive definition of the term since *G.C.B.* and must be presumed to find the definition satisfactory. *State v. Coe*, 109 Wn.2d 832, 846, 750 P.2d 208 (1988) (legislative inaction after judicial decision deemed acquiescence in court interpretation of statute); *Baker v. Leonard*, 120 Wn.2d 538, 545, 843 P.2d 1050 (1993) (amendment to a statute without alteration of a section previously interpreted by the courts evidences legislative acquiescence in the interpretation).

To fairly balance the interests of all persons involved in the adoption relationship—the child, the birth parents, and the prospective adoptive parents—we believe the status of prospective adoptive parents comes into existence only when a child is eligible for adoptive placement. The language in RCW 26.33.350 and .380 references *adoptive* placement, not any out of home placement.[11] The McKinneys knew Abby's placement in their home in 1986 was a foster placement.[12] RCW 26.33.350 and .380 do not mandate disclosure to anyone other than prospective *adoptive* parents, and we decline the McKinneys' invitation to blur the distinction between foster and adoptive parents in light of distinct statutory disclosure provisions for foster and adoptive parents.

Moreover, the McKinneys' argument that prospective adoptive parent status attached before the termination of

---

[11] The WACs cited by the McKinneys regarding disclosure obligations to foster parents are inapplicable. The McKinneys conceded this case addresses disclosure to prospective adoptive parents, not to foster parents. See Report of Proceedings at 13-14, 83, 87, 130-32. Clerk's Papers at 1138-39. The Legislature has created separate disclosure provisions for placement agencies to foster parents, which are not at issue here. See RCW 74.13.280 (regarding client information), RCW 74.13.250 (regarding preservice training). See also WAC 388-73-212(6).

[12] See Report of Proceedings at 73 (The McKinneys' attorney suggests to the Court the filing of the August 1988 adoption application is a "magical date" marking the transition of the McKinneys from "foster family" to "an identifiable adoptive family"); Report of Proceedings at 330 (McKinneys admit Abby came into their home in 1986 as a foster child); Report of Proceedings at 325, 690-91 (McKinneys were licensed as foster parents and received foster care payments for Abby, including a special needs allowance because of her developmental problems).

parental rights as to Abby is flawed in light of strong legislative policy on out-of-home placements. The Legislature has made a clear policy decision that while the best interests of the child are a paramount concern, where feasible, the family unit should remain intact. See RCW 13.34.020, RCW 74.14A.010 and RCW 74.15.010(2). Recent legislation reiterates preservation of the family and reunification of a dependent child with his or her parents are goals for dependent children, where feasible. See generally RCW 13.34.130. See also RCW 74.14C.005-.900. If an out of home placement is necessary, first priority for placement is given to the child's relatives. See RCW 13.34.130(1)(b). In this case, for example, Abby's maternal grandmother was interested in adoption. Thus, until termination of parental rights occurs, there is no assurance that adoption is even a likelihood, and we do not believe the status of prospective adoptive parents can attach regarding such a child.

On the other hand, DSHS's bright-line test is at odds with the language of the statute. Rather than requiring disclosure to adoptive parents, the Legislature mandated disclosure to *prospective* adoptive parents, a status which may be achieved before completion of the home study and entry of the decree of adoption, if the placement agency has formally acknowledged the eligibility of particular parents to adopt a particular child. Plainly, prospective adoptive parent status may be achieved by more than one set of potential adoptive parents; DSHS's argument implies only the ultimately successful adoptive parents are entitled to disclosure. This is not consistent with the statutory language.

In summary, for purposes of RCW 26.33.350 and .380, a person interested in adopting a particular child must formally manifest an intent to adopt, ordinarily in writing. When the adoption placement agency then acknowledges the applicant's interest in a particular child by formally manifesting acceptance of the adoptive parents, usually in writing, the status attaches, triggering the agency's duty to

disclose information as required by RCW 26.33.350 and .380. This approach balances the interests of all parties and provides a workable rule.

In this case, the McKinneys claim a fact question existed as to the date upon which their status as prospective adoptive parents attached. They assert DSHS files and DSHS staff acknowledged them as prospective adoptive parents *earlier* than 1989. While DSHS records indeed indicate the McKinneys had *an interest* in adopting Abby since before placement in 1986, they do not establish the McKinneys had attained the status of prospective adoptive parents. We do not believe the informal intentions of persons interested in adopting a child or words of encouragement from caseworkers who want to see children placed in loving homes are enough to establish the statutory status. The McKinneys were Abby's foster parents. They knew they were foster parents and had no guarantee they could adopt Abby. The rights of the birth parents as to Abby were not terminated until November 1987, the earliest date Abby was even eligible for adoption. The McKinneys filed their adoption petition in August 1988. DSHS gave its formal assent to their eligibility for Abby's adoption by approving their status and request for adoption subsidies on March 21, 1989. Under these circumstances, given our test for prospective adoptive status, the trial court did not err in ruling as a matter of law the McKinneys' prospective adoptive parent status attached on March 21, 1989.[13]

---

[13] The concurrence and the State believe the disclosure obligation of RCW 26.33.350 and .380 arises when the preplacement report on the child required by RCW 26.33.180 has been prepared by the placement agency. The concurrence also states the statutory disclosure duty can be satisfied at *any* time prior to the adoption of the child. We disagree.

The concurrence's approach is inconsistent with the language of the disclosure statutes. RCW 26.33.350 and .380 require disclosure of pertinent information to "*prospective* adopting parents," not "adopting parents." The statutes envision disclosure *before* all the requirements for adoption are met.

Moreover, the policy of the statute is to give prospective adoptive parents appropriate information upon which to make the vital and sensitive decision of whether to adopt. This policy is defeated if the information is provided as late in the process as the concurrence envisions.

C. The Jury's Verdict

The final issue is whether the jury's verdict was correct. The McKinneys assert they would not have adopted Abby had DSHS not negligently withheld information regarding her developmental and other problems. DSHS has not challenged the jury's finding of negligence, but argues the jury verdict on proximate cause was proper.

■ ■ The issues regarding proximate cause are fact-responsive: what did the McKinneys know about Abby's problems, when did they know it, and what was the effect of such knowledge on their decision to adopt Abby? In light of our ruling on prospective adoptive parent status for the McKinneys as stated in Instruction 16, we review the jury's decision only to determine if substantial evidence supports it. *Burnside v. Simpson Paper Co.*, 123 Wn.2d 93, 107-08, 864 P.2d 937 (1994) (overturning a jury verdict is appropriate only when it is clearly not supported by substantial evidence).

Substantial evidence at trial supports the jury's verdict on proximate cause. The McKinneys indicated at trial they had frequent contact with Abby for six months to a year in 1985 baby-sitting for Abby's foster mother. During this time, the McKinneys gained first-hand knowledge of the extensive developmental and behavioral problems plaguing Abby, and became aware Abby was in therapy regarding these problems. During this time, the McKinneys also became aware of rumors Abby had been sexually abused. With this knowledge, the McKinneys decided to adopt Abby before talking with anyone at DSHS.

Between the time Abby was placed with them in August 1986 and March 21, 1989, the McKinneys became progressively aware of Abby's special needs associated with FAS/FAE and other developmental problems. The McKinneys received an additional rate of reimbursement as foster parents for Abby's special needs and later became eligible for an adoption subsidy because of Abby's special needs. The receipt of these additional public funds for Abby's special needs was a particularly significant demonstration that the McKinneys were cognizant of Abby's problems.

The evidence presented at trial indicates the McKinneys already possessed knowledge of most of Abby's problems, which disclosure by DSHS would only have confirmed. Thus forewarned, the McKinneys decided to adopt Abby in 1985. Additional information gained while Abby lived with the McKinneys as a foster child did not deter the McKinneys from their goal of adopting this troubled child. Given what the McKinneys knew, when they knew it, and their decision to adopt Abby anyway, the jury reasonably concluded any subsequent failure by DSHS to disclose information played no role in the McKinneys' decision to adopt Abby. The jury verdict on proximate cause was supported by substantial evidence.[14]

## CONCLUSION[15]

In this very difficult case, we are sensitive to the many competing interests associated with Abby's adoption. The McKinneys, to their lasting credit, fell in love with a child affected by substantial developmental and behavioral problems and a very difficult life history. They, and parents like them, are entitled to the information described in RCW 26.33.350 and .380 before making their decision to adopt.

Adoption placement agencies, whether individuals, DSHS, or private agencies, must give prospective adoptive parents needed information about children so the prospective parents can make a wise decision so fundamentally important to them and their adoptive child. The burden of disclosure must not be such that adoptions will be "chilled" by the specter of litigation; placement agencies are not guarantors the adoptive children will have no physical or psychological special needs, or their familial histories are picture perfect. They must make only reasonable efforts to

---

[14] Given our disposition of these issues, we do not reach the issues of the measure of damages for this cause of action.

[15] The McKinneys move to strike the State's reply brief under RAP 10.1(c) which limits the scope of what the State may address in its reply brief. To the extent the State's reply brief addresses issues not raised in its cross-appeal, we grant the McKinneys' motion and do not consider such aspects of the reply brief.

disclose the statutorily-prescribed medical/psychological and social information on adoptive children.

The trial court's recognition of a cause of action for negligent failure to disclose medical and social information required by RCW 26.33.350 and .380, and its ruling as to when prospective adoptive parent status attaches were correct. Substantial evidence supported the jury's verdict on proximate cause. We affirm the judgment on the verdict of the jury.

DURHAM, C.J., and SMITH, JOHNSON, and SANDERS, JJ., concur.

MADSEN, J. (concurring) — The majority concludes that there is a duty to disclose medical and other information under RCW 26.33.350 and .380 when the status of "prospective adopting parent" arises, and formulates a three-part test to determine when one becomes a "prospective adopting parent." The majority's test is inconsistent with the relevant statutes and fails to carry out legislative intent. Accordingly, while I agree that the McKinneys' negligence action must fail in light of the jury's finding as to proximate causation, I cannot concur in the majority's analysis.

RCW 26.33.350(1) and RCW 26.33.380(1) require that a complete medical report and a family background and family social history report shall be transmitted to "the prospective adopting parent prior to placement . . . ." The "placement" involved plainly is placement for adoption, as that is the concern of RCW 26.33. The second section of RCW 26.33.350, for example, underscores the fact that placement *for adoption* is the key to understanding the statutory duty set forth, because it explains that the required information includes that which "needs to be known by the adoptive parent to facilitate proper health care for the child or that will assist the adoptive parent in maximizing the developmental potential of the child." RCW 26.33.350(2). The information which must be disclosed must be known by the adoptive parents in order to care for the adopted child.

The majority properly recognizes that placement for foster purposes does not trigger the disclosure obligations under RCW 26.33.350 and .380; rather, adoptive placement is referenced in both statutes. Majority at 401. However, the majority then focuses solely on when a person becomes a prospective adoptive parent rather than on when adoptive placement occurs.

The statutes do not say that disclosure must be made when the status of prospective adoptive parent arises. The statutes say that disclosure must be made "prior to placement." Thus, while the disclosure must be made *to* a prospective adoptive parent, the point in time *when* disclosure must be made is not determined by when one becomes a prospective adoptive parent, but rather by when placement for adoption occurs. This is a crucial distinction, because the Legislature has mandated that placement for adoption cannot occur until a preplacement report has been filed with the court.

Rather than the majority's test which is directed at the wrong question, the court should hold the duty to disclose must be satisfied by the time the child is placed for adoption. This standard necessarily requires that certain conditions be met.

First, the statutes are absolutely clear that "a child *shall not* be placed with prospective adoptive parents until a preplacement report has been filed with the court." RCW 26.33.180 (emphasis added). Thus, no duty to disclose can arise unless a preplacement report has been prepared. The purpose of this requirement is obvious from the statute's description of the information which must be provided in the report:

> The preplacement report shall be a written document setting forth all relevant information relating to the fitness of the person requesting the report as an adoptive parent. The report shall be based on a study which shall include an investigation of the home environment, family life, health, facilities, and resources of the person requesting the report . . . . The report shall include a recommendation as to the fitness of the person requesting the report to be an adoptive parent.

RCW 26.33.190(2).[16] The Legislature clearly intended that no placement for adoption is to be made absent a home study providing the necessary information to assess the fitness of the person(s) wishing to adopt to do so. The information in the report is vital in a decision whether to make an adoptive placement with the person(s) requesting the report.

Second, the child must be eligible for adoptive placement. State statutes generally contemplate two ways in which a child may become available for adoption. A birth parent may voluntarily relinquish a child and give consent to adoption, RCW 26.33.080 through .090, or parental rights may be involuntarily terminated under RCW 26.33 or RCW 13.34. RCW 26.33.090(4) provides that if a court approves a petition for relinquishment, "it shall award custody of the child to the department, agency, or prospective adoptive parent, who shall be appointed legal guardian." RCW 26.33.090(5) states that "[a]n order of relinquishment to an agency or the department shall include an order authorizing the agency to place the child with a prospective adoptive parent." The court also may enter a temporary order giving custody of the child to the prospective adoptive parent if a preplacement report has been filed (except if the child is an Indian child). RCW 26.33.090(1).

RCW 13.34.210 provides that when a court enters an order of termination of parental rights, and there is no remaining parent having parental rights, custody of the child is placed in the department or a licensed child-placing agency "for the purpose of placing the child for adoption, or in the absence thereof in a licensed foster home, or take other suitable measures for the care and welfare of the child." The statute also states that "[t]he custodian shall have authority to consent to the adoption of the child . . . ." Id.

Thus, either through relinquishment proceedings or

---

[16] Under RCW 26.33.190(1), "[a]ny person may at any time request an agency, the department, an individual approved by the court, or a qualified salaried court employee to prepare a preplacement report."

through termination of parental rights (or both, for example, where a birth mother relinquishes but the birth father does not, and instead his rights are terminated in accord with statutory standards), the child must be eligible for adoptive placement before placement can be made.

Finally, the child must actually be placed for adoption. Although the statutorily required disclosures must be made by the time placement for adoption occurs ("prior to placement"), it necessarily follows that no duty arises, and no breach of that duty can be found, if a placement *for adoption* never actually occurs. Nor can breach of the statutory duty be found if the required disclosure of information is made any time prior to placement for adoption.

The majority, as noted, correctly concludes that foster care placement does not give rise to a duty to disclose information under RCW 26.33.350 and .380. The statutes simply do not pertain to foster care placement. When a foster adopt situation exists, then, the issue will be when placement for foster care purposes changes to placement for adoption. Until that change occurs, a person with whom a child has been placed for foster care has no assurance that an opportunity to adopt the child will occur. While in some instances this point in time may be indisputable, it is also possible that a fact question as to when placement for adoption occurs may require resolution by a trier of fact. There must be acknowledgment in some form on the part of the prospective adoptive parents and the department or agency that placement is for adoption purposes. However, this acknowledgment need not be in the form of a formal application and a formal acceptance, as the majority requires in its test for prospective adoptive parent status. The majority's standard fails to account for the fact that procedures followed by agencies or individuals effectuating private placements may not be the same as those of the department. Further, the requirement of a "formal" acceptance places too much control of potential liability for negligence in the hands of the department or the agency.

When the emphasis is placed on adoptive placement in

accord with the statutes, the difficulties the majority encounters in deciding when one becomes a "prospective adoptive parent" do not arise. By the time adoptive placement occurs, clearly, one has become a prospective adoptive parent.[17]

The majority concludes, however, that filing of a preplacement report is not a prerequisite to disclosure under RCW 26.33.350 and .380. First, the majority's conclusion is inconsistent with the statutes which provide that disclosure must be made by the time of adoptive placement, and adoptive placement cannot occur without the filing of a preplacement report following a home study.

Second, the majority's reason for rejecting the requirement of a preplacement report does not withstand scrutiny. The majority says such a requirement implies that "only the ultimately successful adoptive parents are entitled to disclosure" and this is not consistent with the statutes. Majority at 404. However, placement for adoption does not mean that adoption will occur. Nothing prevents a person with whom a child has been placed for adoption from deciding after placement that he or she does not wish to carry out plans to adopt. The department or private agency involved may determine that adoption is not, after all, appropriate in the circumstances. *See In re Dependency of G.C.B.*, 73 Wn. App. 708, 719-21, 870 P.2d 1037 (1994) (and cases cited therein). In addition, RCW 26.33.200(1) requires that when a petition for adoption is filed the court shall order a postplacement report made "to determine the nature and adequacy of the placement and to determine if the placement is in the best interest of the child." This statute plainly contemplates that a determination may be made that adoption is not in the best interest of the child, and

---

[17]The Legislature has not always been consistent in its use of the terms "adoptive parent" and "prospective adoptive parent." For example, in RCWA 74.13.100 both terms are used in addressing fees for adoptive services. However, the Legislature has indicated that at the time of placement for adoption, one is a "prospective adoptive parent." RCWA 74.13.103 states that "[w]hen a child proposed for adoption is placed with a *prospective adoptive parent* the department may charge the parent a fee . . . ." (Emphasis added.)

thus the petition for adoption should not be approved. Placement for adoption does not assure that adoption will in fact occur.

Although the majority's test for determining when disclosure must be made under RCW 26.33.350 and .380 is inconsistent with the statutes and the legislative intent they embody; the majority's result is correct in light of the jury's finding on proximate causation. No duty to disclose arose in this case before April 1990, when the preplacement report was filed,[18] because before that time the placement with the McKinneys could not have been an adoptive placement as a matter of law in light of RCW 26.33.180. The jury, however, was effectively instructed that disclosure had to be made no later than March 21, 1989. Since no breach of the duty to disclose information could occur until after the preplacement report was filed, the jury's determination on proximate causation under the instructions given necessarily forecloses the McKinneys' negligence claim.

I concur in the result reached by the majority.

DOLLIVER, GUY, and ALEXANDER, JJ., concur with MADSEN, J.

---

[18] In responding to the argument that "prospective adoptive parent" status is not achieved until a preplacement report is filed, the McKinneys claim that the filing of the report was overdue. Because they have not briefed as an issue any alleged delay in filing, the court should decline to address what action might be available to compel completion and filing of a preplacement report.