[No. 20129-1-II.    Division Two.    October 31, 1997.]

THE STATE OF WASHINGTON, *Respondent*, v. ALVARO AQUINO-CERVANTES, *Appellant.*

*In the Matter of the Personal Restraint of* ALVARO AQUINO-CERVANTES, *Petitioner.*

*Eleanor M. Couto*, for appellant (appointed counsel for appeal).

*James J. Stonier, Prosecuting Attorney*, and *Melanie P. Romo, Deputy*, for respondent.

HUNT, J. — Alvaro Aquino-Cervantes was convicted on two counts of assault while armed with a deadly weapon. On appeal he argues that the attorney-client privilege was violated when an interpreter testified at the CrR 3.5 hearing about Aquino-Cervantes' ability to understand Spanish and English. We affirm.

We also consolidate with this direct appeal and deny Aquino-Cervantes' personal restraint petition.

## FACTS

### A. The Assaults

Aquino-Cervantes and his wife, Kimberly, separated after two years of marriage. In an argument over custody, Aquino-Cervantes threatened to kill Kimberly and the children. A few days later, on August 19, 1996, Kimberly was at home with friends Raul Santanna-Alvarado, Victor Solis-Gonzales, and Julie KillsRee. Kimberly, Solis-Gonzales, and Santanna-Alvarado had been drinking; KillsRee had not. Kimberly became intoxicated and went to bed, where she was later joined by Santanna-Alvarado, who fell asleep next to her. KillsRee and Solis-Gonzales were sleeping in the living room.

At about 2 A.M. Aquino-Cervantes knocked on the door and Solis-Gonzales let him in. Aquino-Cervantes asked KillsRee if his wife was in the bedroom with another man. KillsRee told Aquino-Cervantes to leave. Aquino-Cervantes ran toward the bedroom, kicked open the door, and went into the bedroom where Kimberly was sleeping next to Santanna-Alvarado. Aquino-Cervantes placed a knife against Santanna-Alvarado's neck, threatened to kill him, and cut his neck. Upon noticing that Kimberly was awake, Aquino-Cervantes moved the knife to the side of Kimberly's face. She pushed the knife away, ran into the living room, and tried to call the police, but Aquino-Cervantes cut the telephone cord before the police answered.

Kimberly then ran out the front door and down the stairs. With knife in hand, Aquino-Cervantes chased, caught, and stabbed her several times in the back, head, shoulders and hip. Kimberly ran back into her apartment and fell to the floor. Aquino-Cervantes drove off.

Officer Steve Vera arrived on the scene and saw Kimberly lying on the floor, in a pool of blood, bleeding from her head and back. Vera later interviewed Kimberly, who

provided the license plate number and a description of Aquino-Cervantes' car.

## B. Arrest

Later that evening at about 11 P.M., Officer Mark Taylor of the Mount Angel Police Department stopped and arrested Aquino-Cervantes in Oregon. Taylor searched the car incident to the arrest and discovered a knife in the glove compartment. The car was towed to a police garage.

Detective Michael Hallowell of the Longview Police Department learned that Aquino-Cervantes was in custody in Astoria, Oregon, and went there to interview him. Because Aquino-Cervantes is Hispanic, Hallowell arranged for an interpreter, Marvin Bermudez, to be present during the interview.

At the start of the interview, Hallowell read Aquino-Cervantes his *Miranda*[1] rights in English and Spanish. During the interview, Aquino-Cervantes spoke in English; the interpreter, Bermudez, translated only specific words into Spanish. After agreeing to talk with Hallowell, Aquino-Cervantes admitted to drinking the night of the assault, touching Santanna-Alvarado's neck with a knife, cutting the telephone cord, and stabbing Kimberly. He said that he had parked his car a block away because it would be easier to flee when the police were called. He explained that the knife was still in the car's glove box. Officer Hallowell obtained a search warrant and, in the presence of Taylor, seized the knife from the glove box.

Aquino-Cervantes was charged with one count of first degree assault (for the attack on Kimberly) and one count of second degree assault (for the attack on Santanna-Alvarado). Aquino-Cervantes later waived extradition and returned to Washington for prosecution.

## C. CrR 3.5 Hearing

On October 31, 1995, the Cowlitz County Superior Court

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R. 3d 974 (1966).

conducted a CrR 3.5 hearing to determine the voluntariness of Aquino-Cervantes' statements to the police. At the hearing, Hallowell testified that Aquino-Cervantes was given his *Miranda* rights in both English and Spanish, and indicated that he understood his rights and was willing to talk. Aquino-Cervantes read the English advisement of rights form and translated it into Spanish. The interpreter had told Hallowell that Aquino-Cervantes was translating pretty well. Bermudez testified that during the postarrest interview with Hallowell, Aquino-Cervantes spoke and understood English very well, and spoke in English most of the time. Bermudez believed that Aquino-Cervantes understood his rights.

Officer Edward Jones testified that during a contact with Aquino-Cervantes in 1988, he had no difficulty communicating with Aquino-Cervantes in English. Kimberly testified that during their years together, Aquino-Cervantes spoke primarily in English to her and to their children.

The State also called Marta Ochoa-Rutherford, the certified court interpreter for Cowlitz County. Ochoa-Rutherford had interpreted several times for Aquino-Cervantes, including times when Aquino-Cervantes had consulted with his attorney. Aquino-Cervantes objected to questions to Ochoa-Rutherford involving communications protected by the attorney-client privilege. The trial court overruled the objection, reasoning that the questions related solely to Aquino-Cervantes' ability to communicate rather than to the content of his communications with his attorney. Ochoa-Rutherford testified that she had no difficulty communicating with Aquino-Cervantes and that Aquino-Cervantes understood the conversations. She did not testify concerning the content of these communications.

Iris A. Moebius served as Aquino-Cervantes' interpreter during the CrR 3.5 hearing, during which the trial court asked for her impression of Aquino-Cervantes' apparent ability to comprehend those proceedings. The trial court

overruled Aquino-Cervantes' objection. Moebius testified that she had no difficulty communicating with Aquino-Cervantes and that he understood both the Spanish and English dialogues of the CrR 3.5 hearing.

The trial court determined that Aquino-Cervantes had been fully and fairly advised of his constitutional rights and that he knowingly and voluntarily waived those rights in making his statements to Detective Hallowell. The trial court ruled Aquino-Cervantes' statements admissible.

### D. Trial

Before the trial began, Aquino-Cervantes objected to the use of Ochoa-Rutherford as an interpreter during the trial. Aquino-Cervantes argued that Ochoa-Rutherford's role as a witness for the State during the CrR 3.5 hearing had breached the attorney-client privilege. The trial court explained that it had a statutory obligation to inquire into not only the interpreter's qualifications, but also the ability of the interpreter and defendant to communicate. Noting that Ochoa-Rutherford testified only about Aquino-Cervantes' ability to understand translations for the court proceedings, and not about the actual substance of privileged conversations, the trial court overruled the objection.

### ANALYSIS

The focus of the trial court's CrR 3.5 hearing was whether Aquino-Cervantes had been fully advised of his constitutional rights and had made a knowing and intelligent waiver of those rights before giving a statement to police while in custody in Oregon. In order to so determine, the court needed to know whether Aquino-Cervantes, who was bilingual, had understood his rights as given in English and interpreted into Spanish. English-Spanish interpreters were the best qualified witnesses on this subject, especially Bermudez, who had interpreted Aquino-Cervantes' interview with Hallowell in Clatsop County.

The court inquired about the ability of the interpreters and the defendant to communicate, to ensure that Aquino-Cervantes could understand the forthcoming criminal proceedings.

RCW 2.43.080 requires that: "All language interpreters serving in a legal proceeding, whether or not certified or qualified, shall abide by a code of ethics established by supreme court rule."

> *Except in the interpreter's official capacity,* no language interpreter shall discuss, report, or comment upon a matter in which the person serves as an interpreter. Interpreters shall not disclose any communication that is privileged by law without the written consent of the parties to the communication, or pursuant to court order.

GR 11.1(e) (emphasis added). Here, the interpreters' testimonies were not pursuant to "written consent of the parties" or "court order."

## A. Attorney-Client Privilege — Open Court

Aquino-Cervantes argues that the trial court erred by allowing Ochoa-Rutherford and Moebius to testify at the CrR 3.5 hearing. Aquino-Cervantes contends that the interpreters' testimonies violated the attorney-client privilege and denied him a fair opportunity for cross-examination, abridging his constitutional right to confrontation. The State argues that: the interpreters' testimonies were admissible and not violative of the attorney-client privilege; but even if they were, admission of the testimonies was harmless.

RCW 5.60.060(2) establishes privileged communications between attorney and client. The attorney-client privilege is not absolute. Rather, it is limited to accomplishment of its intended purpose, i.e., to promote a useful relationship between client and attorney by permitting complete disclosure without fear that disclosed information will be used against the client. *Dike v. Dike*, 75 Wn.2d 1, 14-15, 448 P.2d 490 (1968).

## 1. Defendant's Ability to Understand

At the CrR 3.5 hearing, the interpreters were questioned regarding their interpreting roles:

Q: Have you, *in your official capacity as court interpreter*, interpreted for Mr. Aquino-Cervantes?

. . . .

Q: Did — has it ever been your impression when you've been interpreting, that Mr. Cervantes didn't understand what you were saying or didn't — couldn't speak in the — speak, speak and respond, in the Spanish language?

(Emphasis added). Both interpreters testified in their official capacities as court interpreters. The interpreters neither were asked nor testified about the *content* of any dialogue between Aquino-Cervantes and his attorney. The interpreters did not disclose any confidential communications. Rather, the State asked and the interpreters testified about Aquino-Cervantes' *apparent ability* to understand his constitutional rights given in the Spanish and English languages.

■ The purpose of RCW 2.43 is to uphold constitutional rights of non-English speaking persons. RCW 2.43.010. *See also* GR 11.1, *Code of Conduct for Court Interpreters*. The scope of an interpreter's ability to testify has been carefully circumscribed, allowing reporting "in the interpreter's official capacity," but prohibiting: (1) "comment upon a matter in which the person [interpreted]"; and (2) disclosures of "any communication that is privileged by law," absent waiver or court order. GR 11.1(e).

Here both the State and the trial court were scrupulously careful to limit the interpreters' testimonies to Aquino-Cervantes' ability to understand Spanish and English. The State elicited no testimony concerning the substance of any attorney-client communications in the jail or the courtroom.

■ The trial court asked Ochoa-Rutherford about

Aquino-Cervantes' ability to comprehend the trial proceedings; the court had no other way to be sure. Ochoa-Rutherford's testimony may have constituted a "comment upon a matter in which [she] serve[d] as interpreter," but such comment falls within the exception since she was able to testify in her official interpreter's capacity. GR 11.1(e).

## 2. Chilling Effect on Attorney-Client Privilege

Nevertheless, we note the potential chilling effect on the free dialogue encouraged and protected by the attorney-client privilege. *See Coburn v. Seda*, 101 Wn.2d 270, 274, 677 P.2d 173 (1984). We therefore decline to extend GR 11.1(e)'s "official capacity" exception to confidential attorney-client communications. We hold that language interpreters may not testify about observations made during confidential attorney-client communications unless pursuant to the parties' consent or court order. GR 11.1(e).

We analogize to cases holding that the attorney-client privilege extends to third parties indispensable to an attorney's provision of legal services to the client, such as legal secretaries and accountants. While there are no Washington cases on point, other courts and legal authorities have concluded that an interpreter who is necessarily present during attorney-client communications is precluded from testifying about matters disclosed under the attorney-client privilege. *United States v. Kovel*, 296 F.2d 918, 920. 96 A.L.R.2D 116 (2d Cir. 1961); *Hawes v. State*, 88 Ala. 37, 7 So. 302, 312 (1890); *Kansas-Neb. Natural Gas Co. v. Marathon Oil Co.*, 109 F.R.D. 12, 21 (D. Neb. 1983); *Mileski v. Locker*, 14 Misc. 2d 252, 178 N.Y.S.2d 911, 916 (1958); 1 MCCORMICK ON EVIDENCE § 91, at 334 (John W. Strong, ed., 4th ed. 1992); 8 JOHN HENRY WIGMORE, EVIDENCE § 2317 at 618 (John T. McNaughton ed., rev. ed. 1961); 81 AM. JUR. 2d *Witnesses* § 419 (1992).

Ruling on whether to extend the attorney-client privi-

lege to an accountant employed by an attorney to assist a client seeking legal advice, the *Kovel* court analogized to an attorney's use of an interpreter who is

> necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit. . . . What is vital to the privilege is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer.

*Kovel*, 296 F.2d at 922.[2]

The notion that an interpreter acts as an "agent" of the attorney, and therefore should refrain from testifying about confidential matters disclosed during an attorney-client consultation, is supported by analogous case law in Washington. Extending the physician-patient privilege to necessary third parties, Division One of this court held that, " 'if the third person is present as a needed and customary participant in such consultation, the circle of confidence may be reasonably extended to include him and the privilege will be maintained.' " *State v. Gibson*, 3 Wn. App. 596, 599, 476 P.2d 727 (1970) (quoting CHARLES T. MCCORMICK, LAW OF EVIDENCE, § 104 (1954)). If this "circle of confidence" were not so extended, the free flow of information between physician and patient or attorney and client would be chilled by the potential for such third parties to be called as witnesses against the patient or client in future legal actions.

We therefore read GR11.1(e) as prohibiting an interpreter's testimony about, not only content, but also observations made while serving as an interpreter for confidential

---

[2]The *Kovel* court looked to "Wigmore's famous formulation, § 2292," which sets forth the following elements of the attorney-client privileged communications:

> '(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived,' save (7) . . . .

*Kovel*, 296 F.2d at 921.

attorney-client communications, unless such testimony is authorized by court order or written consent of the attorney and client. Although none of the interpreters here testified about the content of any attorney-client communications, some of Ochoa-Rutherford's observations were made while interpreting confidential communications between Aquino-Cervantes and his attorney, including the jailhouse interview. Such observations fell within the attorney-client privilege; thus her testimony about such observations was error. Similarly, insofar as Moebius' observations of Aquino-Cervantes' ability to comprehend the CrR 3.5 hearing may have been derived from her role in interpreting privileged attorney-client communications, such testimony was error.

But it was permissible for Ochoa-Rutherford and Moebius to testify concerning Aquino-Cervantes' *comprehension* of Spanish and English and his ability to understand courtroom translations, based on their observations made during open court, independent of interpreting Aquino-Cervantes' privileged communications with his attorney.

### B. Harmless Error — Jailhouse Attorney-Client Conference

Although Moebius' and Ochoa-Rutherford's testimonies based on observations during privileged attorney-client communications were improper, the error is harmless.[3] Even if the error has been of constitutional magnitude, the error was harmless beyond a reasonable doubt.[4] *State v. Powell*, 126 Wn.2d 244, 267, 893 P.2d 615

---

[3]Our holding is limited to the specific fact pattern of this case. We do not have before us nor do we address the potential use of such interpreter's testimony to rebut a defendant's claim of lack of understanding of language or rights.

[4]Despite Aquino-Cervantes' claims, this case does not present an error of constitutional magnitude. While RCW 2.43 ensures that a person who does not speak English is afforded the constitutional protections of due process, this case involves evidentiary, rather than constitutional, issues surrounding the admission of Aquino-Cervantes' statements to the police.

(1995); *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986); *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985) (citing *Chapman v. California*, 386 U.S. 18, 27, 87 S. Ct. 824, 17 L. Ed. 2d 705, 24 A.L.R. 3d 1065 (1967)). There is no reasonable probability that the outcome of the CrR 3.5 hearing or of the trial would have been different had the errors not occurred. *See Powell*, 126 Wn.2d at 267; *State v Jackson*, 102 Wn.2d 689, 695, 689 P.2d 76 (1984).

█ In weighing the effect of an error, we consider such factors as:

> "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."

*Powell*, 126 Wn.2d at 267 (quoting *Van Arsdall*, 475 U.S. at 684).

Aquino-Cervantes argues incorrectly that "[a]ny information that the interpreters gleaned [was] a direct result of confidential meetings between the appellant and his attorney." This argument ignores the interpreter's information most relevant to the CrR 3.5 inquiry concerning the voluntariness of Aquino-Cervantes' confession, namely Bermudez's observations of Aquino-Cervantes' dialogue with Detective Hallowell, in which Aquino-Cervantes waived his right to an attorney. Thus, the attorney-client privilege was not applicable to that communication.

### 1. Other Evidence of Defendant's Ability to Understand

There was ample other evidence presented at the CrR 3.5 hearing upon which to base a finding of voluntariness and to justify admission of Aquino-Cervantes' statements to the police. Officer Hallowell, as well as Bermudez, the

interpreter from the first police interview, testified that Aquino-Cervantes clearly understood his rights, provided in both English and Spanish, and voluntarily agreed to speak with the officer. Kimberly testified that Aquino-Cervantes spoke English with relative ease. Interpreters Ochoa-Rutherford and Moebius testified about Aquino-Cervantes' ability to comprehend Spanish, English, and the legal proceedings, independent from observations made during privileged attorney-client communications.

## 2. Substantial Evidence Independent of Confession

■ Aquino-Cervantes' statements to the police constituted a small portion of substantial other evidence that supported his conviction. Several eyewitnesses testified that on the night of the attack, they saw Aquino-Cervantes enter Kimberly's apartment with a knife, cut the telephone cord as Kimberly tried to call for help, and chase Kimberly outside when she ran for help. Kimberly testified about Aquino-Cervantes' assaults on both herself and Santanna-Alvarado. KillsRee saw Kimberly struggling with Aquino-Cervantes outside the apartment. Santanna-Alvarado testified that Aquino-Cervantes put a knife to his neck and threatened to kill him.

In sum, although the interpreters' testimonies about observations made during privileged attorney-client communications were error, there was other competent evidence of Aquino-Cervantes' comprehension of his rights and voluntariness of his confessions. But even if the voluntariness of his confession were in doubt, there was substantial other evidence of Aquino-Cervantes' guilt, independent of his confession.

## CONCLUSION

The trial court did not err in allowing interpreters to testify about Aquino-Cervantes' ability to comprehend English, Spanish, his constitutional rights, and the courtroom proceedings, based on observations made in open court

other than while interpreting confidential communications between attorney and client. Error in allowing testimony based on interpreting privileged communications between Aquino-Cervantes and his attorney was harmless. We therefore affirm.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

HOUGHTON, C.J., and MORGAN, J., concur.

Review denied at 135 Wn.2d 1002 (1998).