[No. 52452-6-I. Division One. June 1, 2004.]

JANE DOE, ET AL., *Respondents*, v. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, ET AL., *Petitioners*.

*Thomas D. Frey*, *Marcus B. Nash*, and *Jennifer Anh Tran* (of *Stafford Frey Cooper*), for petitioners.

*Timothy D. Kosnoff*; and *Michael T. Pfau* (of *Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim*), for respondents.

SCHINDLER, J. — The trial court ordered the Corporation of the President of the Church of Jesus Christ of Latter-Day Saints (LDS Church)[1] to disclose the report of church disciplinary action (RCDA) for John Roe, a church member, who abused his stepdaughters, Jane and Rebecca Doe.[2] In analyzing whether the clergy-penitent privilege protected Roe's RCDA from disclosure, the trial court found that the RCDA was a confession "made . . . in the course of discipline enjoined by the church," and that it was made in confidence. However, the court concluded the clergy-penitent privilege did not apply because the LDS Church failed to establish that all participants in the disciplinary proceeding were "regularly licensed or ordained" clergy. We conclude based on LDS Church doctrine that the participants in Roe's disciplinary proceeding were ordained clergy and reverse the trial court's order requiring disclosure of the RCDA.

## FACTS

John Roe, an LDS Church member, sexually abused his stepdaughter Jane Doe and her younger sister, Rebecca Doe. Jane Doe was sexually abused from 1988 to 1995 and her younger sister from 1992 to 1998.

---

[1] The Corporation of the President of the Church of Jesus Christ of Latter-Day Saints is a Utah religious corporation that exists to conduct temporal and legal affairs on behalf of the Church of Jesus Christ of Latter-Day Saints, an unincorporated religious association.

[2] Pseudonyms are used to protect the parties' identities.

According to Jane Doe, sometime in 1995 she met with Bishop Hatch, the bishop of her LDS Church ward,[3] and told him her stepfather was sexually abusing her. After this meeting, Bishop Hatch met with Roe and Doe's mother. Jane Doe's mother testified that the Bishop did not inform her about Roe's abuse of her daughter. Bishop Hatch did not report the alleged abuse to the civil authorities.

In 1998, in an e-mail conversation with a friend, Jane Doe disclosed that her stepfather had sexually abused her for a number of years.[4] The friend notified the new bishop of their LDS ward, Bishop Wade. Bishop Wade reported the alleged abuse to the Stake President, Richard Mitchell. In January 1999, Stake President Mitchell convened a stake disciplinary council to address the sexual abuse allegations against Roe and consider formal church disciplinary action.

Under LDS Church doctrine, an essential prerequisite to being saved is that an individual repent for his transgressions. When an LDS Church member is accused of a serious transgression such as sexual abuse, a stake disciplinary council must intervene and help the church member repent and reestablish a covenant with God. Formal church discipline is administered by a disciplinary council and can result in probation, disfellowshipment,[5] or excommunication. *See* The Church of Jesus Christ of Latter-Day Saints,

---

[3] A "ward" is an LDS Church congregation with 300-600 members within a geographic boundary. There is a bishop for each ward who has ecclesiastical authority over the members. A "stake" consists of a number of wards within certain geographic boundaries and the stake president has ecclesiastical authority over the wards. Even at the higher levels, the LDS Church has a lay clergy. As the Utah Supreme Court has explained:

> A bishop's and stake president's duties include giving spiritual guidance and counsel to the members of the Church in their jurisdiction. They receive no formal educational training as clergymen, are not compensated by the Church, and perform their ecclesiastical duties in addition to their vocations.

*Scott v. Hammock*, 870 P.2d 947, 949 n.1 (Utah 1994).

[4] In November 1998, Roe admitted to his spouse that he had sexually abused Jane Doe. At some point before January 1999, Roe also apparently confessed to his ward bishop.

[5] Disfellowshipment is an intermediate level of formal LDS Church discipline between probation and excommunication. A person who is disfellowshipped remains a Church member, but is no longer in good standing.

*Church Handbook of Instructions, Book 1: Stake Presidencies and Bishoprics.*[6]

John Roe's disciplinary council was held on Sunday January 10, 1999. Roe attended and apparently confessed in the course of the proceeding. The disciplinary council decided the appropriate discipline for Roe was disfellowshipment. LDS Church procedures require that an RCDA be prepared and sent to the Church headquarters in Utah when the discipline is disfellowshipment or excommunication. An RCDA is a summary of the disciplinary proceedings and describes the decision of the council. The LDS Church did not report Jane Doe's allegations that her stepfather sexually abused her to the civil authorities.

In January 2000, Roe's spouse learned that he had sexually abused her younger daughter, Rebecca. Roe's spouse called Child Protective Services to report the abuse. Roe was criminally charged and prosecuted for the sexual abuse of both Jane and Rebecca Doe. Roe pleaded guilty to child molestation in the first degree and was sentenced to prison.

In February 2002, Jane Doe and Rebecca Doe's guardian ad litem, Michael Osborne, filed a tort lawsuit against Roe and the LDS Church for negligence, breach of fiduciary duty, and intentional infliction of emotional distress. The complaint alleges that the LDS bishops and other church officials "breached both a statutorily proscribed duty and a duty of reasonable care by failing to report" Roe's sexual

---

[6] We rely on the current edition of the handbook for the LDS Church doctrine and procedures. Although the parties disagree about the role and nature of the LDS Church disciplinary council, there is no dispute that Roe's disciplinary council was conducted according to the current edition of the LDS *Church Handbook of Instructions*. Respondents Jane Doe and Michael Osborne, guardian ad litem for Rebecca Doe, cite and rely on earlier editions of the handbook. We cannot resolve the doctrinal arguments or conflicts raised by the parties. *See Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 655 (10th Cir. 2002) (churches have the power under the free exercise clause " ' "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine" ' ") (quoting *Equal Employment Opportunity Comm'n v. Catholic Univ. of Am.*, 83 F.3d 455, 462 (D.C. Cir. 1996) (quoting *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116, 73 S. Ct. 143, 97 L. Ed. 120 (1952)); *see also* U.S. Const., amend. I; Wash. Const., art. I, § 11.

abuse of Jane Doe.[7] The LDS Church answered and denied the allegations against it.

In his deposition, Roe asserted the clergy-penitent privilege and refused to answer questions about his disciplinary council proceeding. When Osborne requested production of Roe's RCDA and RCDAs for other church members, the LDS Church objected on the grounds the RCDAs were protected from disclosure by Washington's clergy-penitent privilege statute and Osborne's request violated the Church's federal and state constitutional right of free exercise of religion.[8] *See* U.S. CONST., amend. I; WASH. CONST., art. I, § 11. Osborne filed a motion to compel and the trial court appointed a special master to resolve the discovery dispute.

At the request of the special master, the LDS Church submitted 12 RCDAs under seal for in camera review. After in camera review, the special master sustained the objections of the LDS Church for 11 of the RCDAs but ordered the Church to produce Roe's RCDA. The special master relied on the three part test in *State v. Glenn*, 115 Wn. App. 540, 62 P.3d 921, *review denied*, 149 Wn.2d 1007 (2003), to analyze whether the clergy-penitent privilege applied to Roe's RCDA. Under *Glenn* the LDS Church had to establish that the communications were: (1) made to a member of the clergy, (2) as a "confession . . . in the course of discipline enjoined by the church," and (3) confidential. *Id.* at 546. The special master concluded Roe's communications were a confession under LDS Church doctrine because the church handbook specifies that disciplinary councils are part of a process of repentance and are held "to save the souls of transgressors."[9] The special master also concluded that the RCDA was confidential because the church handbook imposes a duty of confidentiality on all participants in LDS

---

[7] Clerk's Papers (CP) at 10.

[8] In addition, the Church objected because the documents were irrelevant and violated third parties' rights to privacy.

[9] SM 000261. SM designations refer to the record of all documents provided to the special master.

Church disciplinary councils.[10] The special master decided, however, that the clergy-penitent privilege did not apply because the LDS Church had not established that all the participants in Roe's disciplinary council were "regularly licensed or ordained" clergy. The special master's decision states: "Absent proof that the 18 participants in the Roe proceeding were clergy as defined by *Glenn*, the documents relating thereto must be produced."[11] The trial court adopted the special master's decision.[12] We issued an emergency stay and granted discretionary review.

ANALYSIS

The LDS Church contends the trial court erred in requiring production of Roe's disciplinary proceeding RCDA because the clergy-penitent privilege applies and the court's order violates the Church's free exercise of religion under the first amendment to the United States Constitution and article I, section 11 of the Washington Constitution. The LDS Church argues that under its church doctrine each participant in Roe's disciplinary proceeding was an ordained clergy member. Alternatively, the LDS Church argues that all the participants were necessary for the communication to occur.

The only issue on appeal is whether the participants in Roe's disciplinary proceeding were ordained clergy members or necessary for the communication to occur.[13]

The clergy-penitent privilege is statutory and has no apparent origin in the common law. *State v. Buss*, 76 Wn.

---

[10] CP at 289.

[11] SM 000261.

[12] As part of the order appointing the special master, the trial court states that all orders issued by the special master "shall be final and have the same effect as if issued by" the court. CP at 126.

[13] Although Osborne argues that Roe's RCDA does not meet the confidentiality requirement of the clergy-penitent privilege, he did not cross-appeal or assign error to the trial court's finding that Roe's communications were a confession and the disciplinary proceedings were confidential. We therefore do not consider this argument on appeal. RAP 10.3.

App. 780, 784, 887 P.2d 920 (1995), *overruled on other grounds by State v. Martin*, 137 Wn.2d 774, 788, 975 P.2d 1020 (1999).

RCW 5.60.060(3) provides:

> A member of the clergy or a priest shall not, without the consent of a person making the confession, be examined as to any confession made to him or her in his or her professional character, in the course of discipline enjoined by the church to which he or she belongs.

For the privilege to apply, communications between the penitent and clergy must be: (1) made to an ordained member of the clergy, (2) a " 'confession' " . . . " 'in the course of discipline enjoined by the church,' " and (3) confidential. *Martin*, 137 Wn.2d at 791; *Glenn*, 115 Wn. App. at 546. The privilege is held by the penitent, and only the penitent can waive it. *Martin*, 137 Wn.2d at 790-91.

■■ Issues of statutory construction are questions of law, which we review de novo. *Martin*, 137 Wn.2d at 788. When the trial court considers only documentary evidence to decide whether a privilege applies, we also review the evidence de novo. *State v. Wood*, 45 Wn. App. 299, 311, 725 P.2d 435 (1986).

RCW 5.60.060(3) does not define "clergy." The Washington Supreme Court in *State v. Motherwell* analyzed the "clergy" definition in RCW 26.44.020(11) in determining whether clergy members were exempt from the requirements of the child abuse reporting statute. *State v. Motherwell*, 114 Wn.2d 353, 360, 788 P.2d 1066 (1990); RCW 26.44.020(11). RCW 26.44.020(11) defines "clergy" as:

> [A]ny regularly licensed or ordained minister, priest, or rabbi of any church or religious denomination, whether acting in an individual capacity or as an employee or agent of any public or private organization or institution.

The court in *Motherwell* rejected the argument that the reporting statute "clergy" definition applies to nonordained clergy and held that a clergy member's status is "conferred

by license or ordination within one's church or religious denomination," and the clergy member must be functioning in that capacity. *Motherwell*, 114 Wn.2d at 359-60.

In *State v. Buss*, this court concluded that *Motherwell's* determination of who is considered an ordained "clergy" under the child abuse reporting statute "should be coextensive with the [clergy-penitent] privilege under RCW 5.60.060(3)" because both statutory schemes relate to the clergy's rights and obligations to maintain the confidentiality of the penitents' confessions. *Buss*, 76 Wn. App. at 785.

The Supreme Court's approach to defining clergy in *Motherwell* is consistent with its later approach in *Martin*, where the court's interpretation of confession minimized "the risk that [RCW 5.60.060(3)] might be discriminatorily applied because of differing judicial perceptions of a given church's practices or religious doctrine . . . ." *Martin*, 137 Wn.2d at 789. In *Martin*, the court held that the "[d]etermination of the definition of 'confession' . . . is to be made by the church of the clergy member," *Martin*, 137 Wn.2d at 787, and "the religious entity, and not the courts, should 'decide what types of communications constitute confessions within the meaning of a particular religion.' " *Martin*, 137 Wn.2d at 786-87 (quoting *State v. Martin*, 91 Wn. App. 621, 628, 959 P.2d 152 (1998)).

Cases from other jurisdictions also recognize the need to respect doctrinal differences among religions when analyzing the clergy-penitent privilege. *See, e.g., State v. MacKinnon*, 1998 MT 78, 288 Mont. 329, 957 P.2d 23, 28; *Scott v. Hammock*, 870 P.2d 947, 956 (Utah 1994).

Here, it is undisputed that Roe's stake disciplinary council was conducted in accordance with LDS Church doctrine, as outlined in the *Church Handbook of Instructions*. Stake disciplinary councils are ecclesiastical in nature[14] and each

---

[14] Osborne relies on the testimony of Dr. Lloyd Hale, M.D., a stake president and the Church's 30(b)(6) designee in an unrelated Oregon case, for the proposition that disciplinary councils are administrative not ecclesiastical in nature. But Dr. Hale's corrected deposition testimony clarifies the theological distinction between administrative and ecclesiastical proceedings:

participant is ordained to serve on a council. Church authorities select and ordain stake presidents. Stake presidents nominate and ordain bishops. In addition to stake presidents and bishops, there are other officers who are ordained to perform particular functions as clergy. Two counselors, a clerk and an executive secretary, are ordained to assist the stake president. Twelve high priests (male members of the LDS Church over age 40 who profess belief in the church and adherence to its principles) are "called and set apart" by the stake president and ordained by the laying on of hands to serve on the high council and participate in disciplinary councils.[15]

A disciplinary council must be held when a Church member is alleged to have committed child abuse. The stake president, his two counselors, a stake clerk, and the 12-member high council are required to participate in the stake disciplinary council. In addition to these participants, Roe's council also included Roe's bishop and the stake executive secretary.

██ ██ Osborne argues that because the high council members are ordained only for purposes of participating in stake disciplinary councils, they are not clergy. We disagree.[16] Osborne's argument ignores the Supreme Court's

---

"A policy would be an administrative issue, meaning that it deals with how to implement a particular church doctrine . . . . Policy and doctrine are considered core teachings of the Church that members are conscience-bound to follow if they desire salvation . . . ."

Reply Br. at 6.

[15] Setting apart consists of the following ceremony:

1. Lay hands lightly on the person's head.
2. Call the person by his or her full name.
3. State that the ordinance is being performed by the authority of the Melchizedek Priesthood.
4. Set the person apart in the office to which he has been called.
5. Give a blessing as the Spirit directs.
6. Close in the name of Jesus Christ.

SM 000277.

[16] We also disagree with Osborne's statutory argument that "regularly" modifies "ordained." RCW 26.44.020(11) provides that a clergy member must be "regularly

decision in *Motherwell* and too narrowly construes the court's definition of who is an ordained clergy member. According to *Motherwell*, whether a clergy member is an ordained clergy is determined by "ordination within one's church or religious denomination" and whether the ordained clergy member was functioning in a clerical capacity. *Motherwell*, 114 Wn.2d at 359-60.

Here, the parties agree that the stake president and bishop are ordained. The parties also agree that the high council and all other participants were ordained for purposes of the stake disciplinary council by the laying on of hands. According to Stake President Mitchell, who presided over Roe's council, "[f]or purposes of the disciplinary council, all 18 men are functioning in an official clerical capacity and are considered under Church doctrine to be clergy bound by sacred obligations of confidentiality."[17] Under the LDS Church doctrine, all the participants at Roe's disciplinary proceeding were ordained clergy members functioning in a clerical capacity.

In addition, the presence of all the participants in Roe's disciplinary council was necessary for the communication to occur. The presence of a third party does not automatically vitiate the clergy-penitent privilege. "[P]rivilege is not vitiated when the presence of the third person is necessary for the communication to occur, or . . . when the third person is another member of the clergy." *Martin*, 137 Wn.2d at 787.

Osborne argues that because the stake president, not the high council, makes the final disciplinary decision, the role of the high council at Roe's disciplinary proceedings is "perfunctory and dispensable,"[18] and the presence of the stake executive secretary was not necessary for the communication to occur.

---

licensed or ordained." The language is unambiguous and "regularly" modifies "licensed," not "ordained." *Davis v. Dep't of Licensing*, 137 Wn.2d 957, 964, 977 P.2d 554 (1999) (unambiguous statutory language accorded its plain meaning).

[17] SM 000283.

[18] Br. of Appellants at 19.

Church doctrine mandates the attendance and participation of the high council at the stake disciplinary council in cases of alleged child abuse. The role the high council plays at disciplinary proceedings is described in the church handbook. One-half of the high council is appointed to represent the Church member. Councilors may ask questions about the Church member's alleged transgressions and present their views on discipline. The high councilors cannot veto the stake president's disciplinary decision, but the handbook encourages every effort be made to address councilors' concerns and achieve unanimity.

Under LDS Church doctrine, the stake clerk is required to attend at the direction of the stake president. The clerk prepares a summary of the stake disciplinary councils and the RCDA.[19] The stake executive secretary is "an executive assistant to the stake president" who keeps "reference notes on matters discussed, decisions reached, and actions to be taken."[20] Although not required by Church doctrine to attend the disciplinary council, the stake executive secretary's role is analogous to a legal secretary or other third party administrative assistant. See State v. Aquino-Cervantes, 88 Wn. App. 699, 707, 945 P.2d 767 (1997) (administrative assistants are essential for the provision of legal services to occur and do not vitiate confidentiality required by the attorney-client privilege). The presence of the stake executive secretary at Roe's disciplinary council did not vitiate the confidentiality requirement of the clergy-penitent privilege.

■ Osborne claims Roe waived his right to assert the clergy-penitent privilege when he agreed to allow a prior confession to be used in his disciplinary proceeding. Osborne relies on a church handbook provision governing the use of prior confessions that states: "[i]nformation received in a member's confession cannot be used as evidence in a disciplinary council without the member's con-

---

[19] SM 000270.

[20] SM 000270.

sent."[21] Roe allegedly confessed to his bishop prior to the stake disciplinary council. Osborne argues that by agreeing to confess again to the disciplinary council, Roe waived any privilege to both his earlier confession and his confession to the disciplinary council. We conclude that Roe's consent to the use of his prior confidential confession in the disciplinary council did not constitute a waiver of Roe's right to assert the clergy-penitent privilege. The LDS Church imposes a duty of confidentiality in both circumstances. Similarly, the confidential recording and transmission of the RCDA was not a waiver. *See Martin*, 137 Wn.2d at 787.[22] LDS Church procedures require preparation and transmission of an RCDA to church headquarters and maintains its confidentiality.[23]

 Finally, for the first time on appeal, Osborne argues that if Roe's disciplinary proceeding communications are protected by the clergy-penitent privilege, the appropriate remedy is to remand with directions to redact Roe's RCDA. First, Osborne did not raise this issue before the trial court, and we need not consider it on appeal. *Martin v. Mun. of Metro. Seattle*, 90 Wn.2d 39, 42, 578 P.2d 525 (1978). Nevertheless, redaction is not feasible in this case. Roe's disciplinary proceeding communications are inextricably related to the contents of the RCDA.

We conclude that under LDS Church doctrine the participants in Roe's disciplinary council were ordained clergy members and Roe's RCDA is protected by the clergy-

---

[21] CP at 289.

[22] *See also Scott v. Hammock*, 133 F.R.D. 610, 619 (D. Utah 1990). In *Scott*, the court held that the Utah privilege statute applied to the transmission of privileged intrafaith communications from one ecclesiastical officer to another. The court reasoned that a communication from one religious authority to another within the Church hierarchy was necessary for carrying out church discipline. *Id.*

[23] Osborne also argues that Roe waived the privilege when he told his spouse about the sexual abuse in November 1998, prior to the January 1999 disciplinary council. This disclosure to his spouse did not waive his privilege as to the communications in his disciplinary proceeding. Roe has consistently refused to talk about the communications in the disciplinary council or the disciplinary council proceedings. And there is no evidence to the contrary.

penitent privilege.[24] We reverse the trial court's order requiring disclosure of Roe's RCDA and remand for entry of an order denying Osborne's motion to direct the LDS Church to produce the RCDA.

GROSSE and KENNEDY, JJ., concur.

Reconsideration denied July 15, 2004.

Review denied at 153 Wn.2d 1025 (2005).

---

[24] Because of the decision we reach, we need not address the constitutional issues raised by the LDS Church. *Martin*, 137 Wn.2d at 788 (" '[a] reviewing court should not pass on constitutional issues unless absolutely necessary to the determination of the case.' ") (quoting *State v. Hall*, 95 Wn.2d 536, 539, 627 P.2d 101 (1981)).