

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

N.K., an individual proceeding under a )
pseudonym, )
                                     )     No. 67645-8-I
            Appellant,        )
                                     )     DIVISION ONE
           v.                    )
                                     )
CORPORATION OF THE PRESIDING )
BISHOP OF THE CHURCH OF JESUS )
CHRIST OF LATTER-DAY SAINTS, a )
foreign corporation sole registered to )
do business in the State of Washington; )
CORPORATION OF THE PRESIDENT )
OF THE CHURCH OF JESUS CHRIST )     PUBLISHED OPINON
OF LATTER-DAY SAINTS AND )
SUCCESSORS, a foreign corporation )     FILED: July 22, 2013
sole registered to do business in the )
State of Washington; THE BOY )
SCOUTS OF AMERICA, a )
congressionally chartered corporation, )
authorized to do business in the State )
of Washington; and PACIFIC HARBORS)
COUNCIL, BOY SCOUTS OF )
AMERICA, a Washington nonprofit )
corporation, )
                                     )
            Respondents.      )
_____)

BECKER, J. — Appellant NK[1] was molested in 1977 by a volunteer scout leader with a church-sponsored Boy Scout troop in Shelton, Washington, when

---

[1] NK is an adult proceeding by pseudonym.

NK was 12 years old. Thirty-two years later, NK brought negligence claims against the church, the Boy Scouts of America (BSA), and the local boy scouting council, for failing to protect him. These claims were dismissed on summary judgment on the ground that the defendants owed no duty to protect NK from a danger of which they were unaware.

We reverse as to the church and remand for trial. The church had a protective relationship with NK. From this relationship, a duty arose to take reasonable precautions to protect children in the church's care from foreseeable hazards, a category that may include the risk of child sex abuse by scout leaders. This duty does not depend on the church having prior knowledge that its volunteer scout leader was a molester. In any case, there is evidence that church officials did become aware of the volunteer's dangerous propensities several months before he left town. We also reverse orders that limited NK's discovery from the church in time and scope.

As to the scouting defendants, we affirm. There is no evidence that they had a special relationship either with NK or with the adult volunteer who molested him.

## FACTS

The facts are set forth in the light most favorable to NK, the nonmoving party on summary judgment. This court reviews summary judgment orders de novo, engaging in the same inquiry as the trial court. Aba Sheikh v. Choe, 156 Wn.2d 441, 447, 128 P.3d 574 (2006).

In 1977, NK was a 12-year-old boy living in Shelton. NK and his family belonged to the Church of Jesus Christ of Latter-Day Saints (LDS). The church is organized into geographic areas called "stakes." Subunits of stakes are called "wards." NK's family belonged to the Shelton ward, which was part of the Olympia stake. The Shelton ward of the church encouraged boys in the congregation to participate in Boy Scouts. The church sponsored Boy Scout Troop 155.

A ward's leadership is referred to as the "bishopric," which consists of a bishop and a first and second counselor. In 1977, the Shelton ward's second counselor was the chairman of the ward's Boy Scout Committee. A troop has to have a scout committee and officers in order to be chartered by the national Boy Scout organization.

Scoutmasters for Troop 155 are "called" to the position by the bishopric, and then presented to the congregation, where they can be either affirmed or opposed. In 1977, Ben Danford was called and affirmed by the congregation as the official scoutmaster. He was registered on the official troop roster. There was no official assistant scoutmaster.

In the early spring of 1977, a stranger named Dusty Rhodes came to Shelton from Juneau, Alaska. Danford, who met him at the time, thought the stranger seemed untrustworthy. "Rhodes" left town, only to reappear a few months later under the new name of Dusty Hall. Danford testified that Hall was "personable," but he gave only a "vague" explanation of "what he did and who he

3

was and where he came from." Hall worked as a truck driver. He had no children of his own. He had only recently converted to the LDS church. The friends he made in Shelton included NK's parents. Soon, he became engaged to Geraldine Worthy, the best friend of NK's mother. Worthy was a single mother of three young children.

Hall offered to volunteer with the scouting troop. The bishopric met and decided to accept him as a volunteer. Hall quickly assumed substantial responsibilities for the troop's activities, though he was never officially registered with BSA. NK recalls Hall being introduced to him as his new scoutmaster. The other boys and families of the troop and Worthy, Hall's fiancée, also knew him as a scoutmaster. Hall held scout meetings every week. Some meetings were held in the gym, and some were in the church's scouting cabin. There were two keys to the scouting cabin; the bishop had one, and Hall had the other. Hall also took the scouts on camping trips and helped them get their merit badges.

According to NK, Hall began sexually molesting him in the early summer of 1977, about a week after they met. The first two incidents occurred at NK's home. NK testified that the only reason he ever let Hall into his house when his parents were not there "was because he was one of our Scout leaders." The third incident occurred during a troop sleepover at Hall's apartment. Other incidents occurred during scouting campouts, in the church scout cabin after scout meetings, in Hall's car in the church parking lot, or at Hall's workplace. In all, Hall molested NK 20 to 30 times, approximately on a weekly basis. Hall also

4

molested at least two of NK's fellow scouts during scouting events and sleepovers. One scout who was not molested stopped participating in Troop 155 because Hall made his family feel uncomfortable.

On a Sunday at the end of the summer, Worthy learned from her six-year-old son that Hall had molested him. Worthy reported the abuse to the bishop the same day. The bishop told her not to call the police and that he would "take care of it." The bishop tried to contact Hall. Hall gathered his things from Worthy's home and left town the same night. The bishop called church members in Juneau and made other efforts to contact Hall, but Hall could not be located and he never returned.

The bishop held a meeting with the parents of the scouts and asked them to discuss Hall with their sons. Questioned by his parents and then by the bishop, NK denied that Hall had molested him. He did not tell friends or siblings about it either.

NK filed this complaint in November 2009 against BSA, a congressionally-chartered national organization, and Pacific Harbors Council of Boy Scouts of America, one of numerous local councils chartered across the country by BSA. The complaint also named two church defendants: Corporation of the President of The Church of Jesus Christ of Latter-Day Saints and Corporation of the Presiding Bishop of The Church of Jesus Christ of Latter-Day Saints. The two church defendants, who filed a joint answer and are jointly represented, are corporations established to carry out the temporal affairs of the LDS church, a

5

world-wide religious organization with over thirteen million members.

NK alleged that each defendant owed him a duty to protect him from the criminal acts of Hall. He claimed that they failed in their duty in various ways: by failing to check into Hall's background, by allowing him to supervise the children in isolated settings without another adult present, and by failing to train scoutmasters or warn scouts and their families about the danger of sexual abuse in scouting.

In August 2011, the court granted dismissal to all defendants on summary judgment for absence of duty. NK assigns error to the orders of dismissal and also to certain orders imposing limits on discovery from the church.

## DUTY

The existence of a legal duty is a question of law considered on appeal de novo. Sheikh, 156 Wn.2d at 448. A duty to protect another from sexual assault by a third party may arise where the defendant has a special relationship with the tortfeasor which imposes a duty to control the third person's conduct, or it may arise where the defendant has a special relationship with the other which gives the other a right to protection. Niece v. Elmview Group Home, 131 Wn.2d 39, 43, 929 P.2d 420 (1997), citing RESTATEMENT (SECOND) OF TORTS § 315(a) & (b).

The defendants contend none of them owed NK a duty of protection because they did not possess prior specific knowledge that Hall posed a threat to boys. The requirement for prior specific knowledge of the tortfeasor's dangerous propensities applies to the first type of special relationship identified in Niece but

not to the second. For example, in the relationship between parole officer and parolee, where the parole officer has information showing that the parolee is likely to cause bodily harm to others if not controlled, the parole officer is under a duty to control the parolee to prevent him or her from doing harm. Taggart v. State, 118 Wn.2d 195, 219-20, 822 P.2d 243 (1992). But the existence of a duty predicated on a protective relationship requires knowledge only of the "general field of danger" within which the harm occurred. McLeod v. Grant County Sch. Dist. No. 128, 42 Wn.2d 316, 321, 255 P.2d 360 (1953).

In McLeod, a young student was raped by older students in a dark unlocked room beneath school bleachers. The court held that the victim's suit against the school district could go forward even though school officials were unaware of the "vicious propensities" of the older students. McLeod, 42 Wn.2d at 321. The question was whether the harm fell within a "general field of danger" which should have been anticipated.

> [W]e believe that here the general field of danger was that the darkened room under the bleachers might be utilized during periods of unsupervised play for acts of indecency between school boys and girls. If the school district should have reasonably anticipated that the room might be so used, then the fact that the particular harm turned out to be forcible rape rather than molestation, indecent exposure, seduction, or some other act of indecency, is immaterial. Had school children been safeguarded against any of these acts of indecency, through supervision or the locking of the door, they would have been protected against all such acts.

McLeod, 42 Wn.2d at 322. See also J.N. v. Bellingham Sch. Dist. No. 501, 74 Wn. App. 49, 871 P.2d 1106 (1994).

Niece is similar. The plaintiff, a vulnerable elderly patient in a private

group home, was sexually assaulted by an employee. The employee had no criminal history, and the group home had no knowledge of his dangerous propensities. Niece, 131 Wn.2d at 42. The court recognized a special protective relationship between the group home and the patient, similar to that in McLeod. Niece, 131 Wn.2d at 43-44. The court held that the group home could be found liable "as long as the possibility of sexual assaults on residents by staff was within the general field of danger which should have been anticipated." Niece, 131 Wn.2d at 50.

The defendants suggest that McLeod and Niece have been superseded by our Supreme Court's more recent decision in C.J.C. v. Corporation of Catholic Bishop of Yakima, 138 Wn.2d 699, 985 P.2d 262 (1999). One of the three appeals consolidated in C.J.C. was Funkhouser v. Wilson, 89 Wn. App. 644, 950 P.2d 501 (1998), aff'd in part and remanded, 138 Wn.2d 699, 985 P.2d 262 (1999). In Funkhouser, two young members of a Baptist congregation were molested by Wilson, a church deacon. The abuse did not take place on church premises or during church-sponsored activities, but the church had received a report of a previous molestation by Wilson before they decided to make him a deacon. The Supreme Court concluded the trial court erred by dismissing the case on summary judgment for absence of duty. This conclusion was supported by "the conjunction of four factors present in the case":

> [W]e find the conjunction of four factors present in the case before us decisive to finding the existence of a duty is not foreclosed as a matter of law: (1) the special relationship between the Church and deacon Wilson; (2) the special relationship between the Church and the plaintiffs; (3) the alleged knowledge of the risk of harm

possessed by the Church; and (4) the alleged causal connection between Wilson's position in the Church and the resulting harm.

C.J.C., 138 Wn.2d at 724.

The defendants here argue that under C.J.C., a plaintiff must prove each of these four factors as a conjunctive test in order to establish a duty on the part of an organization to prevent abuse of children by a third party, including a duty arising from a special relationship with the child victim. They are mistaken. The first two C.J.C. factors—(1) the organization's special relationship with the tortfeasor and (2) its special relationship with the victims—are well-settled *alternative* grounds from which a duty can arise. RESTATEMENT (SECOND) OF TORTS § 315 (1965), cited in Niece, 131 Wn.2d at 43. "As a general rule, there is no duty to prevent a third party from intentionally harming another unless a special relationship exists between the defendant *and either the third party or the foreseeable victim* of the third party's conduct." Niece, 131 Wn.2d at 43 (emphasis added and internal quotation marks omitted), quoting Hutchins v. 1001 Fourth Ave. Assocs., 116 Wn.2d 217, 227, 802 P.2d 1360 (1991).

It is true that in C.J.C., the court emphasized that the church possessed actual notice that the deacon was a child molester. But the reason for this emphasis was because the allegations were of molestation occurring at the deacon's home, when he was babysitting. "The molestation of these plaintiffs did not occur on church property nor during church-sponsored activities. Defendants did not recommend Wilson as a babysitter." C.J.C., 138 Wn.2d at 730 (Madsen, J., concurring/dissenting). These circumstances removed the case from the

ambit of cases like McLeod and Niece, where the defendants had custody of the plaintiff when the abuse occurred.

The four factors adopted by the C.J.C. court to support the existence of a duty on the part of the Baptist church apply where the alleged abuse occurred at times and places when the institutional defendant did not have custody of the child. See Marquay v. Eno, 139 N.H. 708, 662 A.2d 272 (1995), applying RESTATEMENT (SECOND) OF TORTS § 302B cmt. e, para D (1965) (actor has brought into contact with the victim "a person whom the actor knows or should know to be peculiarly likely to commit intentional misconduct, under circumstances which afford a peculiar opportunity or temptation for such misconduct"), cited in C.J.C., 138 Wn.2d at 723. Nothing in the C.J.C. court's analysis eroded the authority of protective relationship cases like McLeod and Niece that apply in circumstances where the sexual assault occurs at a time and place where the vulnerable victim is in the custody and care of the institutional defendant. In fact, before discussing the four factors mentioned above, the C.J.C. court recognized, as an issue of first impression, that a church's duties to its youth are the same as a school's if the molestation occurs during church activities, when the children are in the "custody and care" of the church:

> The children of a congregation may be delivered into the custody and care of a church and its workers, whether it be on the premises for services and Sunday school, or off the premises at church-sponsored activities or youth camps. As in other agency relationships, a church chooses its officials, directs their activities, and may restrict and control their conduct. In many respects, the activities of a church, and the corresponding duties legitimately imposed upon it, are similar to those of a school. As a matter of public policy, the protection of children is a high priority. In general,

therefore, we find churches (and other religious organizations) subject to the same duties of reasonable care as would be imposed on any person or entity in selecting and supervising their workers, or protecting vulnerable persons within their custody, so as to prevent reasonably foreseeable harm.

C.J.C., 138 Wn.2d at 721-22.

The C.J.C. court cited both Niece and McLeod with approval. We conclude that Niece and McLeod are consistent with C.J.C. and they remain good law. To establish the element of duty arising from a special protective relationship, NK did not have to prove the church had prior specific knowledge that Hall posed a threat.

A duty arising from a protective relationship, as in Niece and McLeod, is limited by the concept of foreseeability. Niece, 131 Wn.2d at 50. The duty "is to anticipate dangers which may reasonably be anticipated, and to then take precautions to protect the pupils in its custody from such dangers." McLeod, 42 Wn.2d at 320. The church contends sexual abuse by an adult volunteer was unforeseeable.

Foreseeability is a question for the jury[2] unless the circumstances of the injury are "so highly extraordinary or improbable as to be wholly beyond the range of expectability." Niece, 131 Wn.2d at 50 (internal quotation marks omitted), quoting Johnson v. State, 77 Wn. App. 934, 942, 894 P.2d 1366 (1995);

---

[2] Typically when there is a jury question as to whether an injury is within the general field of danger which the defendant should reasonably have anticipated, the issue is presented in the "Proximate Cause-Superseding Cause" pattern instruction. WPI 15.05.

11

McLeod, 42 Wn.2d at 323. A sexual assault is not legally unforeseeable "as long as the possibility of sexual assaults . . . was within the general field of danger which should have been anticipated." Niece, 131 Wn.2d at 50.

The court held in Niece that sexual abuse by staff at a group home may be a foreseeable hazard against which reasonable precautions should be taken. Niece, 131 Wn.2d at 51. The court found this to be demonstrated by the prior sexual assaults that had occurred at the group home, an earlier policy at the home against unsupervised contact with residents, expert testimony that such contact was unwise, and legislative recognition of the problem of abuse in residential care facilities. Niece, 131 Wn.2d at 50-51. The church suggests that in this case, there is inadequate support for foreseeability of child sexual abuse because none of the above factors identified in Niece are present.

BSA has long known of sexual abuse occurring in scouting. The files of ineligible volunteers maintained by BSA since 1920 include allegations of pedophilia and "perversion" by adult volunteers. In fact, a BSA procedural manual concerning the files states that the "perversion" cases were the majority of the cases on file.

What knowledge the LDS church had is not as well established. The record does not, for instance, show that the church was given the information about the history of molestation in scouting that was known within BSA. According to a BSA employee who oversaw the set up and maintenance of the ineligible volunteer files, BSA did not inform parents or troop committees about

the existence of the perversion files. Scoutmaster Danford testified that he never received any training from the Boy Scouts about the dangers of sexual abuse. The church contends that the absence of such evidence is fatal to NK's claim against the church.

The general field of danger was that scouts would be sexually abused if a stranger newly arrived in town was permitted to supervise them one-on-one in isolated settings. Whether considered from the standpoint of negligence or proximate cause, such a risk cannot be described as so highly extraordinary or improbable as to compel deciding the issue of foreseeability as a matter of law. See McLeod, 42 Wn.2d at 323-24. A defendant's actual knowledge of the particular danger "is not required if the general nature of the harm is foreseeable under the circumstances." Travis v. Bohannon, 128 Wn. App. 231, 240, 115 P.3d 342 (2005). Therefore, even if there was no evidence that the church knew about specific past incidents of child sexual abuse in scouting, we would decline to decide as a matter of law that sexual abuse by adult scout volunteers was unforeseeable by the church.

The record contains evidence that the danger of sexual abuse by an adult volunteer was one the church reasonably should have anticipated. By 1977, BSA was advising all chartered organizations to maintain "'two deep' leadership for their troops." A church witness from the Juneau branch testified that the church "always had the rule of two adults" in scouting events. Although BSA claims the policy was to ensure continuous leadership for a troop, a reasonable

13

inference is that it was intended to prevent sexual abuse by adults. And as discussed below, we are reversing discovery rulings that prevented NK from developing other evidence bearing on the question of what the church knew about the dangers of sexual abuse in scouting.

Whether a duty exists, then, depends in this case on whether the defendants had a special relationship with the boys in Troop 155 that gave them a right to protection. "The duty to protect another person from the intentional or criminal actions of third parties arises where one party is entrusted with the well being of another." Niece, 131 Wn.2d at 50 (internal quotation marks omitted), quoting Lauritzen v. Lauritzen, 74 Wn. App. 432, 440, 874 P.2d 861 (1994). Examples of special protective relationships are listed in Hutchins, 116 Wn.2d at 228. Often in these cases, "the party that has been found to have a legal duty was in a position to provide protection . . . because he or she had control over access to the premises that he or she was obliged to protect." Lauritzen, 74 Wn. App. at 440-41. For school pupils, in particular, the essential rationale for imposing a duty "is that the victim is placed under the control and protection of the other party, the school, with resulting loss of control to protect himself or herself." Hutchins, 116 Wn.2d at 228. These considerations explain why the C.J.C. court held that when children are delivered into the "custody and care" of a church for church-sponsored activities, the church has the same duty owed by a school or other institution entrusted with the custody and care of vulnerable individuals.

The relationship between the church and the scouts in Troop 155 is similar to the relationship in McLeod between the Grant County School District and its students. Scouting was part of the church youth program. The church selected the scoutmasters and adult volunteers for Troop 155. The church chapel was the registered meeting place for the troop. The church actively encouraged children of the congregation to participate in scouting, and it paid for the boys' participation in the troop. NK's mother testified that the reason she let her son spend time alone with Hall was "because the church held him out as a youth leader who could be safely trusted with our children." Cf. C.J.C., 138 Wn.2d at 725 (placing Deacon Wilson into a position of trust over children "not only brought him into close connection with the children of the congregation, it allegedly inspired confidence to place the plaintiffs in his care"). The church owned a scouting cabin where the boys participated in meetings and scouting activities, away from the custody and protection of their parents. NK testified that Hall sometimes brought him to the cabin outside of meeting times and molested him there. Hall also molested him after scout meetings. The scouting cabin and the other opportunities scouting provided to Hall for isolating his victims are analogous to the darkened room under the bleachers where the rape occurred in McLeod.

The church, noting that the first two incidents of molestation occurred in NK's own home when his parents were away, prefers to characterize Hall's criminal acts as abuse by a trusted family friend rather than being attributable to

15

lack of reasonable care by the church. If NK had been abused only in his own home, the facts would be more like in Funkhouser and, under C.J.C., arguably NK could not establish a special relationship without proof that the Church had reason to know Hall was a molester. But Hall molested NK while both were engaged in scout activities. The fact that NK's parents failed to recognize Hall as a danger does not eliminate the responsibility of the church to exercise reasonable care when children are involved in church-sponsored activities. Just as the protective custody of the school "is substituted for that of the parent," J.N., 74 Wn. App. at 57, the church was substituting for the parent when it had custody of NK. See also Travis, 128 Wn. App. at 241-43 (student was injured while working with a hydraulic log splitter during school-sponsored "Workday"; fact that student's mother gave consent was at most concurrent negligence, not a superseding cause that would relieve the school district of liability). The evidence indicates that the reason NK's parents trusted Hall to be alone with NK is that the church had put its imprimatur upon Hall as an accepted troop leader. We conclude the church had a protective relationship with young NK that, under McLeod and Niece, gave rise to a duty to protect him from foreseeable harms.

We reach the opposite conclusion as to the scouting organizations. BSA and Pacific Harbors Council did not have a custodial responsibility for the troop members. Their relationship to NK was not analogous to the relationship between school and pupil in McLeod.

NK contends a duty of protection under McLeod and Niece was

adequately established for BSA and the local council by evidence of their control over the program and their right to exclude participants. Both BSA and the local council provided training and education regarding how the scouting program was to operate, and both were involved in screening volunteers. BSA would reject the registration of any person whose name appeared in BSA's ineligible volunteer files. BSA distributed a handbook that encouraged boys to trust scout leaders, required registration forms with information about each scout's rank, and collected dues from individual scouts. BSA provided the church with scouting policies and rules, and expected them to be enforced. BSA reserved the right to reject volunteers, leaders, and scouts deemed to be unfit. BSA officials could have excluded Hall from volunteering if they had known about him. The local council also had a degree of control over the activities of Troop 155. The local council convened the larger scale camping outings that occurred each year, stayed in touch with the troop's scoutmaster about fundraising activities and the annual campouts, and facilitated the chartering and registration process for Troop 155.

BSA, of all the defendants, had the most extensive knowledge of the history of sexual abuse in scouting and was in the best position to warn scouts, parents, and local troops of the danger that adults who prey on children may work their way into scouting as volunteers unless reasonable precautions are taken at the local level. But the ability to warn and the right to exclude are not enough to establish a special protective relationship. NK does not cite authority,

and we have found none, that has allowed a case to proceed on the theory of a protective relationship in the absence of a custodial relationship between the organization and the victim. Without a custodial relationship, typically involving on-the-ground control of day-to-day operations, an institutional defendant is not in a position to provide protection from physical danger as a school or church group does for children, or to monitor personal care as a hospital or nursing home does for disabled patients. Because their relationship to the scouts in Troop 155 was not custodial, we conclude BSA and the Pacific Harbors Council did not have a protective relationship with NK.

In addition to the special protective relationship theory, NK alleges that all defendants owed him a duty because they had a special relationship with Hall which imposed upon them a duty to control Hall's conduct. See Niece, 131 Wn.2d at 43, citing RESTATEMENT (SECOND) OF TORTS § 315(a). This duty does depend on proof that the defendant was aware of the tortfeasor's dangerous propensities. As to the scouting defendants, the record does not contain evidence raising an inference that either BSA or Pacific Harbors Council were even aware of Hall's existence. Therefore, those two organizations did not have a special relationship with Hall imposing a duty to control his conduct.

As to the church, however, there is evidence of awareness of Hall's dangerous propensities. A church exposes itself to liability when it allows its youthful members to be supervised by a person known to have a history of sexual misconduct. C.J.C., 138 Wn.2d at 724; M.H. v. Corp. of Catholic

Archbishop of Seattle, 162 Wn. App. 183, 192, 252 P.3d 914, review denied, 173 Wn.2d 1006 (2011). The church claims that it did not have any negative information about Hall until just before he left town at the end of August or early September of 1977. Bishop Gordon Anderson recalled receiving only one report of abuse by Hall. He testified that he responded to it immediately by trying to contact Hall, meeting with the scouting families, and investigating whether any of the scouts suffered abuse. Bishop Anderson said that the report concerned a boy who was molested at a birthday party sleepover. He described it as being organized for a boy "who wanted to have a bunch of boys over to sleep out in a tent." Bishop Anderson said he received the report from "a priesthood brethren" who telephoned and told him he needed to investigate Hall. However, Worthy said she reported to Bishop Anderson that Hall had molested her six-year-old son during two overnight visits to Hall's apartment. She also said that Hall disappeared for good the day after she reported this to the bishop. Worthy's account differs enough from the "priesthood brethren" report that a jury could conclude the bishop received two different reports and that the call about the sleepover occurred some time before Worthy's report mobilized the bishop's investigation.

The inference that the church knew about Hall's misconduct for weeks or months before taking action is further supported by a declaration by Daniel Cowles, Jr., who was a scout in Troop 155 at the same time as NK. The declaration states that during a Boy Scout campout, one of the boys in the troop

told Cowles about being sexually molested by Hall. Cowles' declaration says he reported the allegation to one of the members of the bishopric before the local council Camporee in May 1977. He remembers making the report *before* the May 1977 Camporee because "at the Camporee a man threatened me and told me that I shouldn't tell anyone else." NK submitted the declaration by Cowles as part of his evidence in opposition to the church's motion for summary judgment.

A week later, the church filed a second declaration by Cowles in which he stated that he does not recall precisely when he made the report concerning Hall, but that Hall left town "two or three days after." If this declaration is accurate, Cowles made his report not in May, but several months later, just before Hall left town.

The church argues that the second declaration merely "clarified" the first one. The two declarations are not that easily reconciled. Presented with both, a rational jury could believe Cowles' first declaration to be an accurate recollection and the second a false recantation. Credibility is for the fact finder to decide. Meadows v. Grant's Auto Brokers, Inc., 71 Wn.2d 874, 881, 431 P.2d 216 (1967). We conclude the record manifests the existence of a genuine dispute as to when the church first received actual notice that Hall was a danger to children. To the extent NK alleges tort theories that may depend on proof of the church's awareness of Hall's prior sexual misconduct with children, including the theory affirmed in C.J.C. with regard to Deacon Wilson, the record provides such proof.

NK argues at length in his reply brief that Danford, the registered

20

scoutmaster, was negligent in permitting Hall to become a de facto scoutmaster, and that the scouting defendants are vicariously liable because Danford was their agent with the authority to exercise BSA's right to exclude participants who are deemed unfit for scouting. Vicarious liability is a different theory than duty arising from a special relationship. Niece, 131 Wn.2d at 48. Although the word "agent" appears throughout NK's opening brief, only his reply brief cites authority on the law of agency and expressly sets forth a legal framework for vicarious liability as a theory independent from duty arising from a special relationship. Because the agency theory is argued for the first time in NK's reply brief, we do not consider it. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

## DISCOVERY

NK contends the limitations imposed by the trial court on discovery from the church were too restrictive.

Parties seeking redress in Washington courts have a broad right of discovery. Lowy v. PeaceHealth, 174 Wn.2d 769, 776, 280 P.3d 1078 (2012). An appellate court reviews a trial court's discovery order for an abuse of discretion. T.S. v. Boy Scouts of Am., 157 Wn.2d 416, 423, 138 P.3d 1053 (2006).

In general, NK asked the church to disclose unprivileged information concerning the church's knowledge and handling of previous allegations of child sex abuse in the church in the decades leading up to 1977. In general, the court

limited discovery to information about what the church knew about Hall in particular, having apparently concluded that broader knowledge about the risk of child sex abuse was irrelevant. This analytical error undermines the discovery orders NK has challenged on appeal.

NK noted a deposition under CR 30(b)(6) to obtain live testimony concerning any records maintained by the church dating back to 1950 about individuals who had been accused of "engaging in inappropriate conduct with minors" in the church or in scouting, as well as any policies and procedures in effect between 1950 and 1985 for uncovering sexual abuse of children, investigating allegations, or protecting children from abuse. In December 2010, the court issued a protective order limiting such discovery to the years 1975 through 1980.

In April 2011, NK moved to compel the church to disclose information on 24 topics NK identified in a second CR 30(b)(6) deposition notice. The topics included the church's records, investigation, and knowledge of any allegations of child sexual abuse in the church congregation or in boy scouting between the years of 1975 and 1977. The church resisted this discovery request on relevance grounds summarized as follows in a letter sent to counsel for NK:

[T]he topics are irrelevant. Many of the topics ask for information about "allegations of childhood sexual abuse by a church member." This topic would thus include, for example, cases of incest, cases in which a relative abused a minor, cases in which a neighbor or acquaintance abused a minor, etc. Such events . . . would be of no plausible relevance here. . . . [F]or a negligence claim to be brought against the church, Washington law regarding foreseeability requires . . . the church to have had notice of sexual misconduct by Mr. Hall prior to the abuse of N.K. The deposition topics are not directed at knowledge of Mr. Hall's activities.

The court denied NK's motion with respect to 21 out of the 24 topics. The court again accepted the argument that to be relevant to NK's negligence claim against the church, the evidence had to concern the church's knowledge of a threat posed by Hall specifically.

The court erred in imposing these limitations because specific knowledge of Hall's dangerous propensities is not required to prove a duty arising from a protective relationship such as the church had with NK. The question is whether abuse by Hall was within the general field of danger that should have been anticipated. The church contends it was completely unaware of any danger posed by allowing troop members to be alone with an unvetted and unsupervised adult volunteer. The information requested by NK is highly relevant to the issue whether the danger was reasonably to be anticipated and the related issue whether the church failed to take reasonable steps to protect NK from that danger.

In view of the relevance of information about how much the church knew about the problem of child sex abuse, either generally or through its involvement in specific incidents, there is no tenable basis for the limitation on the temporal

23

scope of discovery to the one or two years before Hall arrived in Shelton. Cf. T.S., 157 Wn.2d at 418 (affirming, against BSA's challenge concerning the proper test to be used where privacy interests are allegedly at stake, an order permitting discovery of BSA's ineligible volunteer files over several decades leading up to the alleged abuse). The temporal limitation is reversed.

During the dispute over NK's motion to compel the CR 30(b)(6) deposition, church witness Paul Rytting disclosed for the first time that the church's risk management division "currently has some records relating to acts of sexual abuse that allegedly occurred in the years 1975-1977 (such as the records generated by this case)." The church successfully resisted NK's motion to compel discovery of the risk management records, arguing that they were created in the course of litigation that occurred after 1977 and were therefore beyond the temporal limitation imposed by the trial court. The limitation on discovery of the risk management documents generated after 1977 is also reversed. If, for example, a scout victim came forward in 2005 and claimed that his parents told a church leader in 1976 that a scoutmaster was molesting him, such information would be relevant to what the church knew in 1976 about abuse in scouting.

The trial court also erred in accepting the church's argument that the topics of NK's inquiry are protected by clergy-penitent privilege. Privileges from discovery are to be narrowly construed. Trammel v. U.S., 445 U.S. 40, 50-51, 100 S. Ct. 906, 63 L. Ed. 2d 186 (1980); C.J.C., 138 Wn.2d at 717.

The church's argument relies on Jane Doe v. Corp. of President of Church of Jesus Christ of Latter-Day Saints, 122 Wn. App. 556, 90 P.3d 1147 (2004), review denied, 153 Wn.2d 1025 (2005). Jane Doe involved a claim by two women that their stepfather, an LDS church member, had abused them when they were children and that the church breached a duty of care by failing to report the abuse after their stepfather confessed it in a proceeding of a church disciplinary council. The trial court ordered the church to produce a record of the proceeding. On discretionary review, the only issue was whether the participants in the disciplinary council "were ordained clergy members or necessary for the communication to occur." Jane Doe, 122 Wn. App. at 562. This court held that production of the record was barred by the clergy-penitent privilege because the disciplinary council was ecclesiastical in nature, its purpose was to permit the accused to "repent and reestablish a covenant with God," and all the participants were ordained clergy as defined by the church. Jane Doe, 122 Wn. App. at 559, 564-66.

Here, the church claims that any information it might possess related to the church's knowledge of accusations and investigations of child sexual abuse would be contained in "records of church disciplinary proceedings." The church argues that any such information is protected under Jane Doe.

Jane Doe bars production of a record of a confessional proceeding because it contains privileged communications. It does not necessarily bar production of other information that may be in the disciplinary files pertaining to

25

what happened before and after the proceeding. The church's description of the disciplinary files indicates that they contain information that does not fall into the category of privileged communications, for example, information about the event that caused the church to convene a penitential council. The manager of confidential records for the LDS church, Gregory Dodge, testified, "Most commonly, a member's confession is the event that triggers the council." Assuming (without deciding, because it has not been briefed) that the privilege applies to a confession to a nonclergy member before a disciplinary council is convened, there must be some cases in which the event that triggers the meeting of a disciplinary council is an accusation rather than a confession. Indeed, in Jane Doe, the council was convened because Jane Doe disclosed the abuse to a friend, who disclosed it to a bishop, who reported it to a stake president, who convened a stake disciplinary council. Jane Doe, 122 Wn. App. at 559.

If the disciplinary files contain information in the relevant time period concerning similar accusations or complaints, such as a letter or documentation of a telephone call or other personal contact, and such allegations are then used to start an investigative or disciplinary process, this information must be disclosed even if it is stored in a file with a record of confession of the type described in Jane Doe.

The church's interrogatory responses state that bishops keep "an open-door policy" for purposes of receiving any congregation member's concerns, including reports of abuse. Leaders of the church's children and youth programs

are asked to bring such concerns to the bishop, and the church members who are aware of crimes are encouraged to report them to police. The church's General Handbook of Instructions for the "Church Judicial System" states that "*Before* deciding whether to convene a Church court," the member should be interviewed. (Emphasis added.) If the member denies the accusation, the bishop or stake president should "conduct an investigation to obtain further evidence." These materials suggest the existence of documents outside the scope of the clergy-penitent privilege that would be responsive to NK's request for information about allegations and investigations.

The church argues, however, that it is impossible to find out whether disciplinary files contain nonprivileged information because, according to Dodge, the files are maintained only to document "the ecclesiastical relationship" between the member and the church. Dodge states that a discipline file "records that person's spiritual standing in God's kingdom, whether he or she is a member of the Church in good standing, and whether the member is worthy to partake of the Church's sacred sacraments and otherwise participate in the Church." According to Dodge, the only persons allowed to review these records are those who "have an ecclesiastical reason for doing so, for example, the Bishop or the Stake President in charge of the ward in which the member or former member resides." The church argues that the very act of searching, conducted for the church by an attorney or risk manager, would "violate the sanctity of these sacred, privileged communications." Indeed, it appears that no one inside or

outside the church, including Dodge, has yet examined any disciplinary files to see if they are responsive to NK's request. Dodge speaks only hypothetically of what "would be" in such files: "Other documents in every discipline file would be correspondence with the member advising the member when and where the council will be held, and a post-council letter advising the member of the outcome."

The church's argument here is similar to the argument our Supreme Court rejected in Lowy when it held that the statutory privilege for quality assurance records did not prevent a hospital from conducting an internal review of information generated by a quality improvement committee in order to locate unprotected information. Lowy, 174 Wn.2d at 773. In other words, a privilege cannot be used "as a shield to obstruct proper discovery of information" generated internally by the institution. Lowy, 174 Wn.2d at 777-78 (internal quotation marks omitted), quoting Coburn v. Seda, 101 Wn.2d 270, 277, 677 P.2d 173 (1984). Adopting the church's position, to paraphrase Lowy, would permit and even encourage a church to require that all reports and correspondence concerning accusations, investigations, and incidents of sexual abuse or other crimes be deposited in the disciplinary files where they could remain insulated from discovery. See Lowy, 174 Wn.2d at 781. On remand, an effective way must be devised for the church to review the disciplinary files and extract from them any nonprivileged information.

The church also raises First Amendment concerns. To the extent the

church may be arguing that nonprivileged information in the disciplinary files is shielded by the First Amendment, we disagree. "The First Amendment does not provide churches with absolute immunity to engage in tortious conduct. So long as liability is predicated on secular conduct and does not involve the interpretation of church doctrine or religious beliefs, it does not offend constitutional principles." C.J.C., 138 Wn.2d at 728. This basic principle should guide the trial court in reconsidering the discovery orders at issue in this appeal and in deciding new discovery issues that may arise on remand.

The order granting summary judgment to BSA and Pacific Harbors Council is affirmed. The order granting summary judgment to the church defendants is reversed. The protective orders and the orders denying the motions to compel pertaining to discovery requested from the church are reversed and remanded for reconsideration consistent with this opinion.

Becker, J.

WE CONCUR:

Appelwick, J.

Cox, J.

29