IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| C.L., a sexual abuse victim, and Simeon J. Osborn as litigation guardian for S.L., a minor child and sexual abuse victim, | ) ) ) ) ) No. 74892-1-I |
| | ) DIVISION ONE |
| Respondents, | ) ) |
| v. | ) ) |
| STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, | ) PUBLISHED OPINION ) ) FILED: August 21, 2017 ) |
| Appellant, | ) ) |
| and | ) ) |
| JANE and JOHN DOES 1-100, | ) ) |
| Defendants. | ) ) ) |

BECKER, J. — The Department of Social and Health Services placed two dependent children for adoption without discovering that a member of the adopting family was previously reported to the department for molesting a child. On summary judgment, the trial court established the department's liability for the years of sexual abuse the children experienced in the placement and dismissed the department's affirmative defenses as lacking evidentiary support. A jury awarded damages of $4 million for each child. We affirm.

## FACTS

Sisters C.L. and S.L. were born in 1996 and 2000, respectively. As young children, they lived with their mother in Everett. Their father was incarcerated out of state. Child Protective Services received reports that the girls' mother was using drugs and was abusive and neglectful. The girls were removed from her care in 2002 and were found dependent.

C.L. and S.L. lived in various foster homes, including one placement with some friends of Benjamin and Carolyn Lange. The Langes decided to apply for a foster license specifically so that they could be a placement for the two girls. The Langes had three biological sons, born in 1987, 1989, and 1992. The application asked, "Have you, or anyone in your family, been sexually or physically abused? And, have you or anyone in your family been a perpetrator or had a restraining order or protective order filed?" The Langes disclosed that their middle son, Dillon, had been "sexually abused by an older girl (with a history of abuse)" during school hours when he was in kindergarten and first grade. They said Dillon had received counseling "and is ok now."

The Langes did not disclose that Dillon was also an alleged perpetrator of sexual abuse. The department had in its files a referral to Child Protective Services concerning an incident in 2001, when Dillon was 12. According to the intake report, Dillon's 12-year-old cousin walked into a room and saw Dillon put his penis into the rectum of a 5-year-old cousin. The incident was reported to law enforcement for investigation. The officers who investigated the accusation

2

against Dillon reported they were unable to establish probable cause because neither Dillon nor the younger boy admitted to sexual conduct.

The social worker responsible for reviewing the Langes' foster application did not discover the 2001 referral concerning Dillon. The State issued a license to the Langes in December 2002 and placed the girls in the Lange home in June 2003. Social workers who checked up on the girls documented positive observations about their assimilation into the Lange family. The girls reportedly appeared bonded with Benjamin, Carolyn, and the three boys.

In late 2003, the State terminated the rights of the girls' biological parents. The Langes expressed interest in adoption.

The department was required to complete a preplacement report making a recommendation as to the fitness of the prospective adopters based on their "home environment, family life, health, facilities, and resources." Former RCW 26.33.190(2) (1991). Social worker Helen Anderson completed a preplacement report on the Langes. The report mentions that Dillon was molested. It does not mention that Dillon allegedly molested his cousin because Anderson did not see the 2001 intake report when gathering information on the Langes, although she admitted in a deposition that she should have. Her preplacement report states that background checks on Carolyn, Benjamin, and their oldest son did not reveal any disqualifying information. Anderson recommended that the adoptions go forward.

The department was also required to complete a postplacement report before the adoption was finalized. RCW 26.33.200(1). The postplacement

3

reports referred to the preplacement reports and concluded that the Lange home was adequate. A court approved the adoptions on August 24, 2004.

Around this time, the two younger boys—Dillon and Colten Lange—began to subject the girls to sexual abuse. C.L. testified that Dillon began molesting her when she was 8 and he was around 14. She said Dillon would come into her room at night, undress her, and touch her breasts and vagina with his hands, penis, and mouth. She said that this occurred on a regular basis until she was 12, that Colten regularly abused her during the same timeframe, and that both boys at times put their penises in her mouth. S.L. testified to similar experiences with Dillon from when she was 6 or 7 until she was 11, and at least once with Colten. She said if she told Dillon to stop, he would cover her mouth or choke her, and would threaten to kill her if she told anyone.

C.L. testified that she told Carolyn about the sexual abuse in 2011. Carolyn "didn't believe" C.L. and told her that if anything had happened, she "just needed to forgive" her brothers.

In August 2013, C.L. told her friend and her friend's mother about the sexual abuse. They contacted Child Protective Services. C.L. did not go back to the Lange home. The State removed S.L. from the Lange home in November 2013. During the ensuing police investigation, Colten confessed to having sexual contact with the girls. Dillon confessed to some of the allegations.

This lawsuit was filed on December 31, 2014, alleging the department's negligence in screening the background of the Lange family before facilitating the placement and adoption of the girls by the Langes. The complaint particularly

4

alleged that the department facilitated the adoption despite having information that Dillon had been accused of having anal intercourse with his younger cousin. The department's answer denied liability and stated numerous affirmative defenses.

Trial was set for January 2016 with a discovery cutoff in November 2015. The plaintiffs sent out initial interrogatories and requests for production in January 2015. The department serially produced thousands of pages of documents, many of them duplicative. The parties engaged in numerous communications about discovery issues.

After a hearing on November 13, 2015, the court granted the plaintiffs' motion for partial summary judgment to establish the department's liability and to dismiss the department's affirmative defenses. A trial occurred in which the jury was instructed that negligence and causation had already been established. The jury returned a verdict awarding $4 million in damages to each child. This appeal followed.

A negligence action requires a showing of duty, breach, causation, and damages. Ranger Ins. Co. v. Pierce County, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). Summary judgment is proper only when there are no genuine issues of material fact. CR 56(c). After the moving party has established an absence of factual issues, the burden shifts to the nonmoving party to set forth specific facts sufficiently rebutting the moving party's contentions and disclosing the existence of a material fact. Petcu v. State, 121 Wn. App. 36, 54, 86 P.3d 1234, review

denied, 152 Wn.2d 1033 (2004); Seven Gables Corp. v. MGM/UA Entm't Co., 106 Wn.2d 1, 12-13, 721 P.2d 1 (1986).

## DUTY

The existence of a legal duty is a question of law considered de novo on appeal. N.K. v. Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints, 175 Wn. App. 517, 524-26, 307 P.3d 730, review denied, 179 Wn.2d 1005 (2013).

The department contends there are no common law duties that apply to the department's functions related to the case management of foster children. In the department's view, the only actionable claim against the department by a child who is abused in a foster or adoptive placement is a claim for negligent investigation premised upon and limited to the confines of RCW 26.44.050. This statute, which requires the department to investigate child abuse, has been interpreted to imply a cause of action for negligent investigation of abuse. M.W. v. Dep't of Soc. & Health Servs., 149 Wn.2d 589, 595, 70 P.3d 954 (2003). The department argues that C.L. and S.L. cannot prevail under RCW 26.44.050 because they do not allege that the department negligently investigated a child abuse referral pertaining to them.

The department's attempt to confine the plaintiffs to a cause of action for negligent investigation of child abuse is unsupported. The M.W. court, while finding no duty was owed in the particular circumstances of that case, recognized an actionable duty that flows from the department to children and parents who are harmed when the department's negligence results in placing a child into an

abusive home. M.W., 149 Wn.2d at 597. In the Babcock case, our Supreme Court "implicitly approved" a claim of negligence against the department for failing to adequately investigate the backgrounds of prospective foster parents. Tyner v. Dep't of Soc. & Health Servs., 141 Wn.2d 68, 79, 1 P.3d 1148 (2000), discussing Babcock v. State, 116 Wn.2d 596, 809 P.2d 143 (1991). A number of statutes and regulations direct the department to protect children by doing a careful evaluation of a foster or adoptive home before recommending placement. See, e.g., RCW 26.33.010; RCW 74.15.010; WAC 388-148-1320, -1370. Statutory imperatives as well as strong public policy grounds support recognition of a cause of action in tort for prospective adoptive parents against adoption placement agencies that negligently fail to disclose pertinent information about the child. McKinney v. State, 134 Wn.2d 388, 397, 950 P.2d 461 (1998). The tort duty arises from the special relationship between adoption placement agencies and adopting parents McKinney, 134 Wn.2d at 397. Logically, a tort duty also arises from the special relationship between the department as a placement agency and dependent children, allowing such children to seek a tort remedy when they are damaged by the department's negligent failure to uncover pertinent information about their prospective adoptive home.

Under the common law, a duty to protect another from sexual assault by a third party may arise where the defendant has a special relationship with the other which gives the other a right to protection. N.K., 175 Wn. App. at 525-26. The existence of a duty predicated on a protective relationship requires knowledge of the "general field of danger" within which the harm occurred. McLeod v. Grant

7

County Sch. Dist. No. 128, 42 Wn.2d 316, 321, 255 P.2d 360 (1953). The evidence in this case establishes beyond dispute the department's protective relationship with the two plaintiffs and the department's knowledge that a home in which a sexual predator resides is dangerous to children.

After the department filed the appellant's brief in this matter, Division Two of this court recognized that the department owes to dependent children a duty of reasonable care to protect them against foreseeable tortious or criminal conduct in a foster family home. HBH v. State, 197 Wn. App. 77, 92, 387 P.3d 1093 (2016), petition for review filed, No. 94529-2 (Wash. May 22, 2017).

> Absent proper monitoring by the State, a foster child is wholly exposed to the will of the foster parents, whether that will is a blessing or a horror. In this setting, the State is the last watchman of the foster child's well-being. A more compelling illustration of the bases of a special relationship . . . is hard to imagine.

HBH, 197 Wn. App. at 92. HBH is consistent with the earlier cases cited above and other cases finding a duty of protection arising from a special relationship under RESTATEMENT (SECOND) OF TORTS § 315(b). The special relationship duty exists regardless of whether the department breached the duty imposed by RCW 26.44.050. HBH, 197 Wn. App. at 86 n.2.

HBH is cited in the brief of respondent. The department's reply brief does not attack the reasoning of HBH. Instead, the department claims that the plaintiffs sought to establish liability solely by pursuing their cause of action for negligent investigation under RCW 26.44.050. This is incorrect. The complaint pleaded common law and statutory duties. The plaintiffs' motion for summary judgment argued common law and statutory duties. We may affirm a summary

judgment order on any basis supported by the record. <u>Redding v. Virginia Mason Med. Ctr.</u>, 75 Wn. App. 424, 426, 878 P.2d 483 (1994). The record in this case solidly supports the court's decision to find the element of duty established as a matter of law.

BREACH

The department contends that issues of fact preclude summary judgment on breach.

Helen Anderson, the department employee who completed the adoption preplacement report, did not discover the 2001 referral on Dillon when reviewing the Langes as potential adopters. She candidly admitted in her deposition that she "should have seen it" because it was a Child Protective Services file that she should have received when she did the background check on the Langes. As far as Anderson knew, the referral was available in the department's computer system and she was "certainly competent on the computer systems," but "why I didn't get this, I don't know." She testified she "would not have placed" the girls with the Langes if she had seen the referral. Anderson was "surprised" to see that the Lange home had previously been approved for foster care in light of Dillon's alleged sexual misconduct as reported to the department. She regretted that she did not know about the referral when she met with the girls in the course of her review because "if the girls were abused, I think that was something that was foreseeable."

Expert witness Barbara Stone, who had worked for the department for more than 30 years, submitted a declaration that the department breached the

9

standard of care by recommending and facilitating the adoption of C.L. and S.L., notwithstanding the 2001 referral. "The standard of care for social workers during the foster placement process always includes a referral search for prior sexual abuse." Stone observed that "a simple computer search for any member of the Lange family would have revealed the sexual abuse history of Dillon Lange within less than ten minutes." In her opinion, the Langes should not have been licensed for foster care "without further exploration."

The department presented the declaration of expert witness Joan Rycraft that the actions of the department's social workers who licensed the Lange home for foster care, placed the girls there, and recommended adoption by the Langes, "were reasonable and met the social work standard of care."

In general, when experts offer competing, apparently competent evidence, summary judgment is inappropriate. See Larson v. Nelson, 118 Wn. App. 797, 810, 77 P.3d 671 (2003). But conclusory statements of fact will not suffice to defeat a motion for summary judgment. Grimwood v. Univ. of Puget Sound, Inc., 110 Wn.2d 355, 359-60, 753 P.2d 517 (1988). Rycraft's conclusory statement that the standard of care was met does not rebut Stone's testimony that the department breached the standard of care by failing to discover critical information in its own files. Anderson herself acknowledged the breach.

The parties debate whether Rycraft's declaration should be disregarded on the issue of breach to the extent that it contradicts her deposition testimony.

10

We need not address this controversy.[1] Stone and Anderson testified that to meet the standard of care, the department's workers should have known of the referral accusing Dillon of child molestation and in view of that information should not have recommended the adoption. To rebut this evidence, the department needed evidence that even if the department employees had known about the referral, it would have been reasonable for them to recommend and facilitate the placement of the girls into the Lange home. Rycraft's declaration does not make this statement and thus does not raise an issue of material fact as to breach.

Summary judgment will be affirmed only if, from all the evidence, reasonable persons could reach but one conclusion. Petcu, 121 Wn. App. at 55. We conclude that no reasonable juror, properly instructed on the department's duty, could hear the evidence in this record and find that the department met the standard of care.

## CAUSATION

The department contends the issue of proximate cause should have gone to the jury. Cause in fact is established by showing that but for the defendant's actions, the claimant would not have been injured. Petcu, 121 Wn. App. at 56. It is ordinarily a question for the jury unless reasonable minds could reach but one conclusion. Petcu, 121 Wn. App. at 56.

Prima facie proof of causation is provided by Anderson's testimony that if she and her supervisor had seen the referral on Dillon, they "would not have

---

[1] Consequently, we do not decide the department's motion to strike additional authorities submitted by respondents after oral argument in this court.

placed them in there," and by Stone's opinion that but for the department's negligence, the two girls would not have experienced the years of sexual abuse in the Lange home.

Citing Rycraft's declaration, the department argues that an issue of fact as to causation is created by a licensing statute, which stated that an unfounded report of child abuse or neglect may not be used to deny a foster home license.[2] Rycraft opines that because the law enforcement investigation ended inconclusively, the 2001 referral about Dillon did not rise to the level of "a founded child abuse report." Accordingly, the department contends the referral could not have been used as a basis for denying the Langes' application for a foster care license.

The licensing statute is irrelevant. The allegation in the referral was that Dillon engaged in criminal conduct; it was not a report of child abuse by Benjamin or Carolyn. And the adoption was not an administrative proceeding in which the Langes were contesting the department's refusal to issue them a foster home license. The department social workers, if aware of the allegations against Dillon, would have had every right and reason to recommend denial of the Langes' application.

---

[2] In any adjudicative proceeding regarding the denial, modification, suspension, or revocation of a foster family home license, the department's decision shall be upheld if there is reasonable cause to believe that:

　　(a) The applicant or licensee lacks the character, suitability, or competence to care for children placed in out-of-home care, however, no unfounded report of child abuse or neglect may be used to deny employment or a license.

Former RCW 74.15.130(2)(a) (2004).

But for the department's evaluation of the Langes as capable of providing a safe home, the girls would not have been injured. The evidence is unequivocal that knowledge of the 2001 referral would have caused the department to recommend against placement and adoption. A reasonable jury could not speculate that the adoption petition would have been presented to and approved by the court in the face of what the department knew or should have known about Dillon.

Because the record shows no genuine issues of material fact as to duty, breach, or causation, the court correctly granted partial summary judgment establishing liability.

## AFFIRMATIVE DEFENSES

The department's answer stated affirmative defenses including (1) failure to state a claim; (2) for the purpose of RCW 4.22.070(1), any damages were caused by the fault of nonparties including the girls' biological mother and Carolyn, Benjamin, Colten, and Dillon Lange; (3) damages caused by the intentional conduct of other persons or entities must be segregated from damages allegedly caused by the department; (4) the plaintiffs may have failed to mitigate their damages; (5) the department's actions manifested a reasonable exercise of judgment and discretion and are not actionable; (6) claim preclusion; (7) court decisions were an intervening, superseding cause; (8) immunity for certain matters asserted; and (9) the State's potential entitlement to an offset from any award to the plaintiffs.

The trial court dismissed the department's affirmative defenses for failure to set forth specific facts showing a genuine issue of fact and alternatively as a sanction for alleged discovery violations.

Striking all of the State's affirmative defenses was a severe sanction for a discovery violation. In imposing a severe sanction, a trial court is obliged to make findings that lesser sanctions would not have been adequate, that the discovery violation was willful, and that the violation substantially prejudiced the other party. Burnet v. Spokane Ambulance, 131 Wn.2d 484, 494, 933 P.2d 1036 (1997). The trial court must "explain its reasons on the record" and cannot rely on the record to speak for itself. Blair v. TA-Seattle E. No. 176, 171 Wn.2d 342, 349, 254 P.3d 797 (2011). The order needs to be supportable at the time it takes effect, not in hindsight. Blair, 171 Wn.2d at 350. Thus, the findings on the Burnet factors must be made "in the order itself or in some contemporaneous recorded finding." Teter v. Deck, 174 Wn.2d 207, 217, 274 P.3d 336 (2012).

We are not convinced the trial court complied with these requirements. During the hearing on November 13, the court did not specifically address the Burnet factors. Findings supporting the decision were not entered until January 8, 2016, when the trial was about to begin.

We nonetheless affirm the order dismissing the affirmative defenses. The record supports the alternative ground that the department's response to the motion to strike the defenses on summary judgment did not show the existence of a genuine issue of material fact as required by CR 56(e).

14

A party moving for summary judgment can meet its burden by pointing out to the trial court that the nonmoving party lacks sufficient evidence to support its case. Guile v. Ballard Cmty. Hosp., 70 Wn. App. 18, 21-22, 851 P.2d 689 (citing Young v. Key Pharms., Inc., 112 Wn.2d 216, 225 n.1, 770 P.2d 182 (1989)), review denied, 122 Wn.2d 1010 (1993). The moving party must identify those portions of the record that demonstrate the absence of a genuine issue of material fact. Guile, 70 Wn. App. at 22. The burden then shifts to the party with the burden of proof at trial. Young, 112 Wn.2d at 225. As the defendant, the department bears the burden of proving affirmative defenses. E.g., Brougham v. Swarva, 34 Wn. App. 68, 75, 661 P.2d 138 (1983). As the nonmoving party, the department could not rely on the allegations made in its pleadings but was obligated to set forth specific facts showing that there was a genuine issue for trial on the affirmative defense. See Young, 112 Wn.2d at 225-26.

Plaintiffs' motion argued that the department's lack of evidence was shown by its evasive responses to interrogatories. One interrogatory requested "the factual basis for each and every affirmative defense" alleged in the department's answer. The department's initial and supplemental responses to this interrogatory were prefaced by objections that it was "overly broad and unduly burdensome," it called "for the mental impressions and legal theories of defense counsel," it was "work product and not discoverable," and it was a "trap for Defendant because it can easily produce claims that the Defendant did not completely respond to the request." The objection was followed by: "ANSWER: Without waiving the above objections, see generally, Answer." Related

15

interrogatories and requests for production were given similar treatment. Throughout the discovery period, the department's position on its affirmative defenses remained opaque, supported primarily by string cites to identification numbers of "documents previously produced."

Plaintiffs' motion, filed on October 16, 2015, claimed they were entitled to dismissal of the affirmative defenses "unless Defendant produces evidence sufficient to establish a prima facie case for each affirmative defense alleged by the Defendant in its answer."

On October 29, 2015, the department provided several pages of supplemental discovery responses. These responses did no more than repeat the department's answer to the complaint:

- the biological mother of the girls as well as their adopting parents were at fault for failing to protect the girls and for concealing information;

- Dillon and Colten were negligent and had committed intentional torts;

- damages should be segregated to each intentional tortfeasor;

- the girls "may have failed to mitigate their damages by declining therapy and services";

- prior court orders and the abusive acts of the Lange brothers operated as superseding, intervening causes of harm, relieving the department of liability;

- the department "may be entitled" to an offset for funds the girls received from state programs such as foster care, adding "This response may be supplemented";

- an interrogatory about the defense of contributory or comparative fault "calls for attorney work product," but without waiving that objection, "Defendant may either supplement this answer or waive this affirmative defense at trial";

- an interrogatory asking whether the department believed nonparties were at fault or liable was objectionable as calling for attorney work product, but without waiving the objection, the Langes and the biological mother of the girls "are wholly responsible for the injuries that Plaintiffs claim. This answer may be supplemented as discovery continues."

On November 2, 2015, the department filed a response to the plaintiffs' motion for summary judgment, claiming that the facts stated in the supplemental discovery responses on October 29, 2015, provided prima facie grounds for denial of the motion to dismiss the affirmative defenses.

The department's response brief of November 2, 2015, did not address the prima facie showing necessary to establish any particular affirmative defense. Nor did it associate any particular document with any particular affirmative defense. The brief rested on the mere allegations of the department's answer to the complaint accompanied by numerical references to thousands of otherwise undifferentiated documents. The department, as the nonmoving party, did not meet its burden under CR 56(e) to show the court a genuine issue of material fact that would justify sending the affirmative defenses to the jury for decision.

17

## EVIDENTIARY RULINGS

The department assigns error to three evidentiary rulings made at trial. We will not alter a trial court's decision to admit or exclude evidence unless "a substantial right of the party is affected." ER 103(a).

The trial court excluded a statement that the older girl gave to police the same day she initially reported the sexual abuse. The department claims there are inconsistencies between the statement and her trial testimony. The department was permitted to explore the alleged inconsistencies at trial through cross-examination. The department fails to show how the exclusion of the statement, if error, affected a substantial right.

The department contends the court should have excluded, as hearsay, a detective's testimony about his report of a recent interview with Dillon, who at the time of the interview had not been convicted. Some of Dillon's remarks during the interview could be interpreted as admissions of guilt. The department initially raised a hearsay objection. But after an extensive colloquy, counsel for the department said, "I think the Court can allow the admissions to come in" without those portions that were irrelevant and unduly prejudicial. In view of this colloquy, we conclude the hearsay objection was not preserved.

The department claims the court conveyed a personal opinion to the jury during closing argument by allowing plaintiffs' counsel to refer to testimony offered by the younger girl's guardian ad litem, while prohibiting the department from discussing the same testimony. The rulings do not convey a personal opinion and in any event were not prejudicial.

18

No. 74892-1-I/19

Affirmed.

WE CONCUR:

_Becker, J._

_Mann, J._                    _Verellen, J._